**GULF TRADING & TRANSPORTATION CO., Plaintiff-Appellee,**

v.

**The VESSEL HOEGH SHIELD, her engines, tackle and appurtenances, in rem, Defendant,**

**A/S Alliance, Claimant and owner of the Vessel HOEGH SHIELD; her engines, tackle and appurtenances, in rem, Claimant-Appellant.**

**No. 80–1988.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 7, 1981.

Rehearing and Rehearing En Banc Denied Feb. 10, 1982.

---

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Robert M. Julian, Houston, Tex., for claimant-appellant.

James Patrick Cooney, Houston, Tex., for plaintiff-appellee.

Before BROWN and TATE, Circuit Judges, and SMITH **, District Judge.

JOHN R. BROWN, Circuit Judge:

Before us is an admiralty action *in rem* brought by plaintiff Gulf Trading & Transportation Company (Gulf), a division of Gulf Oil Corporation. The action was brought against the Vessel HOEGH SHIELD (Vessel), a vessel documented under the laws of and flying the flag of Norway and owned by A/S Alliance of Oslo, Norway. At all material times, the Vessel was under time charter to Multinational Gas & Petrochemical Co. (Multinational). Under the charter, Multinational was required to provide bunkers to the Vessel. About July 1, 1977, Multinational made a request of Gulf's London office to arrange for the delivery of bunkers to the Vessel at Cristobal, Canal Zone. On July 5, 1977, intermediate fuel oil and marine diesel oil were delivered to the Vessel at Cristobal, and an invoice was sent to Multinational in London. The invoice has never been paid.

Subsequent to the above transactions, Multinational became insolvent. About De-

** District Judge of the Northern District of Mississippi, sitting by designation. Judge Orma R. Smith was a member of the panel that heard oral arguments, but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. 46(d).

cember 1, 1977, the Vessel arrived at the Port of Texas City, Texas. This action was commenced by a complaint which expressly invoked F.R.Civ.P. 9(b) and prayed for the issuance of traditional process and judgment *in rem*, and a Writ of Seizure was issued, but prior to the seizure of the Vessel, an agreement was reached for the posting of security. No bunkering contract existed between Gulf and the Vessel's owner at any relevant time. The Canal Zone was within the jurisdiction of the United States at all times material to the delivery of the bunkers to the Vessel and the filing of the complaint.

### In The District Court

The owner of the Vessel contends that the exercise of *in rem* admiralty jurisdiction over the Vessel offends the Due Process Clause of the Fifth Amendment of the United States Constitution under the Supreme Court's decision in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *see also Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349. The District Court distinguished the rule in *Shaffer*, which involved sequestration of local assets to obtain jurisdiction over nonresident defendants from an admiralty action *in rem* to enforce a maritime lien against a foreign vessel that accepts necessaries delivered within the jurisdiction of the United States.

The Vessel's owner also raises the issue of whether the law of the United States, England, or Norway should apply. The District Court held that because the bunker fuel was delivered to a foreign flag vessel by an American supplier within the jurisdiction of the United States, and because the invoice specified payment in the United States, the admiralty and maritime law of the United States applied to this case.[1]

The District Court further held that the bunker fuel delivered by Gulf to the Vessel in the Canal Zone constituted a "necessary" within the meaning of § 971 of Title 46,

U.S.C.A., and thus a maritime lien arose upon the furnishing of the fuel absent a finding that the necessary was furnished solely on personal credit. The Court observed that while Gulf obviously relied upon the credit of Multinational, no evidence exists that Gulf relied solely on the personal credit of Multinational or otherwise disclosed an intention to forego its maritime lien on the Vessel. The Court concluded that Gulf acquired a maritime lien in the Vessel upon the delivery of bunkers to that vessel in the Canal Zone.

The District Court found it unnecessary to rule on the constitutionality of Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims, F.R.Civ.P., and awarded judgment to Gulf for the contract value of the fuel plus interest.

### Arguments On Appeal

The Vessel's owner, A/S Alliance, brought this appeal, urging that (i) the applicable substantive law in this case is English Law; (ii) the District Court denied procedural due process of law to the Vessel's owner by rendering judgment without submission of briefs or a hearing on the central issues in this cause, thereby precluding the Vessel's owner from compelling answers to interrogatories relevant to the choice of law issue; (iii) the Vessel's owner received no benefit from the fuel contract between Gulf and Multinational, and Gulf did not rely on the credit of the Vessel, so no maritime lien exists against the vessel even if American law is applied; and (iv) present maritime *in rem* procedures are insufficient to fulfill Constitutional due process requirements.

The Vessel's owner points out that Gulf and Multinational had a long relationship of contracting in England for fuel for Multinational's chartered vessels, and argued that the stability of the relationship between Gulf and Multinational indicated that they intended English law to apply in these fuel contracts rather than the laws of the many nations where fuel was supplied.

---

1. The District Court also held that a dismissal of this action under the doctrine of *forum non conveniens* was not called for.

Moreover, Gulf's credit clerk, when deposed, suggested that the fuel was furnished on the credit of Multinational. When the fuel was not paid for, the Vessel could have been seized immediately, but Gulf took no such action until Multinational became insolvent, thus depriving the Vessel's owner of any meaningful action against Multinational for whose direct benefit the fuel was ordered. Without prior hearing the Vessel was to be seized by the United States Marshal in Houston. Therein lies the Vessel-owner's claim that the admiralty *in rem* procedures are constitutionally inadequate, even though the vessel was never actually seized.

### Choice Of Law: English Or American?

Of critical importance to the choice of law issue before us is our determination, discussed *infra*, that a maritime lien on the Vessel existed in favor of Gulf. As will become clear, our conclusion below that United States law applies to the present controversy is limited to the unique circumstances surrounding a maritime lien as well as the statutory directives found in the Maritime Lien Statute, 46 U.S.C. § 971. This is not to say that this Court is permitted to bootstrap its determination of choice of law by a preliminary finding that a maritime lien exists, but only suggests that the initial choice of law determination is significantly affected by the statutory policies surrounding a maritime lien.[2]

A modern approach to maritime conflict of law problems was introduced in *Lauritzen v. Larson*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), 1953 A.M.C. 1210. *Lauritzen* involved a torts claim under the Jones Act, and is thus distinguishable on its

facts from the present controversy. Nevertheless, the Court's approach in reviewing many of the factors that are generally conceded to influence choice of law governing a tort claim, and its assignment of weight and significance to each factor, presents a useful outline for our present determination.[3]

A distinction must be drawn at the outset between the express contract to provide bunkers involving only Gulf and Multinational *and* the application of a maritime lien in favor of Gulf against the vessel. Gulf's claim to a maritime lien in the Vessel arises by operation of law rather than by contract because the Vessel's owner was not a party to the contract between Gulf and Multinational. *See Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973), 1973 A.M.C. 1431, 1433. The present controversy, and the validity of the maritime lien imposed upon the Vessel, is broader than the failure of Multinational to pay for the necessaries provided to the Vessel.

Viewed solely as a contract dispute, the Vessel owner's arguments that English law should apply are persuasive. Section 188 of the *Restatement (Second) of Conflicts of Law* suggests that in the absence of an effective choice of law by the parties, the forum contacts to be considered include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Here the place of contracting was Great Britain, where Gulf contracted to provide bunkers to the Vessel chartered to Multinational.

---

**2.** *See Lauritzen v. Larson*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), 1953 A.M.C. 1210:

Maritime law, like our municipal law, has attempted to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved. The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transac-

tion regulated and the national interest served by the assertion of authority.
*Id.* at 582, 73 S.Ct. at 928, 97 L.Ed. at 1267, 1953 A.M.C. at 1218–19.

**3.** The *Lauritzen* Court considered (i) the place of the wrongful act, (ii) the law of the flag, (iii) the allegiance or domicile of the injured, (iv) the allegiance of the defendant shipowner, (v) the place of contract, (vi) the inaccessibility of a foreign forum, and (vii) the law of the forum. 345 U.S. at 583–91, 73 S.Ct. at 928–32, 97 L.Ed. at 1268–72, 1953 A.M.C. at 1219–26.

The place of negotiation was also Great Britain, although Gulf argues in its brief to this Court that some negotiations occurred in New York when the order for the delivery of bunkers was confirmed by telex from the Gulf bunkering office in New York. The place of performance, a significant factor, was the Canal Zone, which was at the time of the performance in the jurisdiction of the United States. The location of the subject matter of the contract can also be construed as the Canal Zone.[4] Finally, the parties to this action are an American corporation doing business in Great Britain and a Norwegian vessel flying the Norwegian flag. In this isolated analysis, it is arguable that English law would apply to a contract in dispute between Gulf and Multinational. This is, however, only half of the story.

Leaving the contract, and entering the broader context of the maritime lien involving Gulf and the Vessel's owner, the *Restatement (Second) of Conflicts of Law* § 6 sets forth principles to be applied in choice of law matters. In the absence of statutory directives and subject to constitutional restrictions, the relevant factors include (a) the needs of the international system, (b) relevant policies of the forum, (c) relevant policies of other interested states, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. The basis of the present action is the Maritime Lien Statute, which states:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971. The congressional intent is that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the goods or services are supplied or performed in the United States. It is not disputed that the bunkers were furnished by Gulf to the vessel within the jurisdiction of the United States and under the shelter of United States law. This Court has recognized that

> [it] was the intent of the Congress to make it easier and more certain for stevedores and others to protect their interests by making maritime liens available where traditional services are routinely rendered.... Speaking to the desired aim of the 1971 amendments [which deleted the clause which had allowed "no lien" provisos in charter contracts], the House Report concludes:

> > Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed.

*Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 201 (1979) (citations omitted). It is our conclusion that the Maritime Lien Statute represents a relevant policy of this forum that serves the needs of the international legal system as

---

4. It must be noted that, to the extent not consumed in departure from the Canal Zone, the fuel delivered was immediately carried away from the jurisdiction of the United States.

Comment e to section 188 of the *Restatement (Second) of Contracts of Law* states that when a contract deals with a specific physical thing, or affords protection against a localized risk, the state where the thing or the risk is located will have a national interest in transactions affecting it:

> [The] parties will regard the location of the thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

*Id.* In the present controversy, the bunker ("thing") was only briefly in the Canal Zone.

well as the basic policies underlying maritime law. Moreover, there is little difficulty in determining and applying the law in the present controversy, as will be discussed in the next section, *infra.*

Of equal importance in choice of law matters is the predictability of result and protection of justified expectations in a particular field of law. In the maritime realm, it is expected that when necessaries are furnished to a vessel in an American port by an American supplier, the American Maritime Lien Statute will apply to protect that supplier regardless of the place where the contract was formed or the nationality of the vessel. Although, *arguendo,* it is conceivable that the contract between Gulf and Multinational could have specified that English or any other Nation's law would govern the rights under the contract, in the present controversy there is no such intention to override American law.

■■■ Finally, we recognize that the policies and interests of other governments are often relevant in the determination of choice of law matters. Despite the fact that the contract between Gulf and Multinational was formed in Great Britain, it cannot be argued that Great Britain would have as great an interest as the United States in protecting an American supplier of fuel to a non-English vessel in an American port. We are thus in complete agreement with the District Court in its application of American instead of English law to the present controversy.

### Does A Maritime Lien Exist?

The Vessel's owner, as claimant, argues in the alternative that even if American law applies to the present controversy, Gulf did not rely on the credit of the vessel in this case. Therefore, the claimant argues, no maritime lien exists. It points out that Gulf's agent, in a deposition, stated that the credit in this instance was extended to the charterer, Multinational, and further observes that no conversations took place between Gulf's credit department and the

Vessel's owner. Moreover, no invoice was sent to the Vessel's owner.

■■■ The Maritime Lien Statute, 46 U.S.C. § 971, provides that a supplier of necessaries to a vessel shall have an enforceable maritime lien on the vessel, "and it shall not be necessary to allege or prove that credit was given to the vessel." *See Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 273, 60 S.Ct. 937, 940, 84 L.Ed. 1197, 1200, 1940 A.M.C. 647, 650. A presumption therefore arises that one furnishing supplies to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charterer was solely relied upon. In *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.,* 261 F.2d 861, 867 (5th Cir. 1958), this Court held that in order to overcome the presumption, evidence must be produced that would permit "the inference that the supplier purposefully intended to forego the valuable privilege which the law accords. . . ." *Id.*

We agree with the District Court's conclusion that while Gulf obviously relied upon the credit of the charterer Multinational in furnishing bunkers to the Vessel, there is no evidence that Gulf relied *solely* on the personal credit of Multinational or otherwise took any action with the purposeful intention of foregoing its maritime lien in the Vessel. Although we agree with the claimant that it is possible for the furnisher of supplies to waive its right to a lien,[5] we agree with the District Court's holding that the record indicates that the transaction was carried out in such a way as to preserve Gulf's maritime lien. The Marine Bunker Delivery Receipts, as well as the invoice sent to Multinational, reflect the name of the Vessel HOEGH SHIELD. We agree with Gulf that when the transaction is considered as a whole, nothing was purposely done by Gulf to waive the maritime lien that arose as a matter of statutory law upon the furnishing of bunker fuel to the Vessel in a United States port.

**5.** *See* 46 U.S.C. § 974.

## Procedural Due Process In The Trial Court

The Vessel's owner also argues that it was denied procedural due process by the Trial Court's rendering judgment without allowing submission of briefs or a hearing on the central issue in this controversy. It claims that the Trial Court's action in this regard precluded it from moving for compulsion of answers to certain interrogatories relevant to the choice of law issue discussed above. Apparently, the Vessel's counsel understood that following a choice of law determination, the parties would submit briefs on the central issue of whether a maritime lien existed on the Vessel. Gulf argues that the Vessel's owner knew and understood that the case was being submitted for final determination on a stipulated record. The Vessel's owner, Gulf argues, was not prevented from filing a brief on the remaining unresolved issues.[6]

The District Court, having heard the evidence and argument of the parties in this controversy, entered a final judgment in favor of Gulf on August 12, 1980. The Memorandum and Opinion of August 12, 1980, was clearly dispositive of the entire case, and because no motion was made at that time by the Vessel's owner regarding additional evidence and argument, we regard this issue as inconsequential.

## The Constitutionality Of Rule C

The final argument of the Vessel's owner on this appeal is that the maritime *in rem* procedure is insufficient to fulfill Constitutional due process requirements. Obviously, counsel for the vessel were informed of the impending seizure, following a tradition that goes back to the origin of the now abandoned title of "Proctor in Admiralty" to accept a letter of undertaking in lieu of seizure. Thus there was no seizure, and hence no seizure without notice. Consequently, the Constitutionality of seizures pursuant to Rule C is not raised and we

need not pass on the District Court's handling of this matter.

AFFIRMED.

---

**6.** The District Court, in its memorandum and opinion of March 26, 1980, directed the parties "to come forward with the remaining issue or issues."