For the above reasons, the district court's judgment is

AFFIRMED.

EQUILEASE CORPORATION,
Plaintiff-Appellant,
Cross-Appellee, .

v.

M/V SAMPSON, etc., et al.,
Defendants-Appellants,
Cross-Appellees,

v.

FRED S. JAMES & CO., etc.,
Intervenor-Appellee,
Cross-Appellant,

FRED S. JAMES & CO., etc.,
Plaintiff-Appellee,
Cross-Appellant,

v.

EQUILEASE CORP., et al.,
Defendants-Appellants,
Cross-Appellees.

No. 83–3298.

United States Court of Appeals,
Fifth Circuit.

April 25, 1986.

W. Eugene Davis, Circuit Judge, filed opinion concurring in part and dissenting in part, in which Randall and Patrick E. Higginbotham, Circuit Judges, joined.

Philip A. Franco, Adams & Reese, Frank M. Adkins, New Orleans, La., for Equilease Corp.

James G. Burke, Jr., Burke & Mayer, Kimbley A. Kearney, New Orleans, La., for Fred S. James & Co.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.*

E. GRADY JOLLY, Circuit Judge:

The facts of this case are reported in detail in the district court opinion *Equilease Corp. v. M/V Sampson*, 568 F.Supp. 1259 (E.D.La.1983), and in our panel opinion, *Equilease Corp. v. M/V Sampson*, 756 F.2d 357 (5th Cir.1985). We agreed to hear this case en banc to decide the issue whether insurance is a necessary under the Federal Maritime Lien Act, 46 U.S.C. §§ 971–975 (1982) ("FMLA" or the "Act"), so that an unpaid insurance company may claim a federal maritime lien on the insured vession.

---

* Due to his death on March 27, 1986, Judge Albert Tate, Jr. did not participate in this deci-

sel.[1] We now expressly overrule *Learned v. Brown,* 94 F. 876 (5th Cir.1899), and hold that marine insurance is a necessary under the Federal Maritime Lien Act, and thus may be given the status of a federal maritime lien.

## I.

The essential facts are these. Equilease is a financing corporation that in 1974 provided interim construction financing for three vessels. In 1977 the vessels' owner defaulted on its loan and Equilease became the owner of the vessels. Equilease transferred title to each vessel to one of three separate, wholly-owned, nominally capitalized "shelf" corporations, taking a preferred first mortgage from each corporation in the amount of construction cost and other expenses.

Equilease then issued a bareboat charter on each vessel to a company wholly owned by James Denning. Denning transferred the charters to Dunnamis Offshore Touring, Inc., another corporation he owned. As required by the charters, Dunnamis purchased insurance for each vessel. The insurance was purchased from various insurance companies through the agent Fred S. James & Company of Texas, Inc. ("James"), at a cost of over $200,000. When $184,000 of the insurance premiums remained unpaid at the end of the first policy year, James, instead of suing Dunnamis for the balance, arranged financing of the premiums with Borg-Warner Insurance Finance Corporation ("Borg-Warner"). Borg-Warner paid Dunnamis' debt to James, and James' accountant credited Dunnamis' account in full. James guaranteed the debt by endorsing a note executed by Dunnamis to Borg-Warner. As a result of this guarantee, James, rather than Borg-Warner, bore the risk of Dunnamis' non-payment to Borg-Warner.

Dunnamis soon defaulted on the charter agreement with Equilease. Equilease located and seized the vessels, and instituted proceedings in federal district court to foreclose on its preferred mortgages.

By that time Dunnamis also had defaulted on its insurance note payments to Borg-Warner. James, who later satisfied the debt, intervened in the foreclosing proceedings, claiming a state privilege[2] and a maritime lien against the vessels for unpaid insurance premiums. James also filed a separate but substantially similar lawsuit against Equilease and Dunnamis in personam, and against the three vessels in rem. The district court consolidated the actions.

After hearing the evidence, the court held that James had a state privilege against the vessels for the amount of the unpaid insurance premiums, and that because Dunnamis acknowledged the debt within six months of the filing of the lawsuit, the applicable six-month limitations period had been interrupted and thus had not lapsed. It refused, however, to recognize a federal statutory maritime lien in favor of James, relying on this court's decision in *Learned v. Brown,* 94 F. 876 (5th Cir.1899). It then invalidated the preferred mortgages against the vessels on the basis that the three Unilease corporations were "shams" and "alter egos" of Equilease, and reduced Equilease to the status of a general creditor against the vessels. It further held that Dunnamis was not an agent of Equilease with the power to obligate Equilease to pay the premiums. The district court entered judgment in favor of James in rem against the vessels and in personam against Dunnamis.

---

**1.** Although under the Fifth Circuit's internal operating procedures the effect of the granting of a rehearing en banc is to vacate the panel opinion, see Internal Operating Procedures following Local Rule 35.6, the court today reinstates the panel's ruling in Parts II, III, IV, and V of its opinion, *Equilease Corp. v. M/V Sampson,* 756 F.2d at 360–62.

**2.** The Louisiana Civil Code provides that a debtor's property is the common pledge of his creditors, and in the absence of cause for preference, the creditors rank equally. La.Civil Code art. 3183 (West 1952). One cause of preference is the privilege, which arises by operation of law, and allows a creditor preferred status over other creditors because of the nature of the debt owed him. La.Civil Code arts. 3184 and 3186.

The panel reversed the district court, holding that the six-month period was one of peremption, not prescription, and thus could not have been interrupted by Dunnamis' acknowledgement of the debt. The state lien had therefore expired, so James had no state claim against the vessels. The panel then held that it could not overrule *Learned v. Brown*, 94 F. 876 (5th Cir.1899), and letting that decision stand, ruled that there was no federal maritime lien for unpaid insurance premiums.

## II.

The issue before the en banc court is whether we should overrule Learned and recognize a federal maritime lien in James' favor for the unpaid insurance premiums. In refusing to recognize such a lien, the district court and the panel both followed the precedent of Learned, which held that maritime insurance on a vessel is for the sole and exclusive benefit of the vessel owners, not inuring to the benefit of the vessel, and therefore that no lien arises for unpaid insurance premiums under general maritime law.

Learned was decided in 1899, eleven years before the passage of the Federal Maritime Lien Act, 46 U.S.C. §§ 971–75. The decision was based on general maritime principles that denied a lien for materials and services rendered in the vessel's home state. Because the vessel in Learned was a Louisiana vessel operating solely within Louisiana, the Fifth Circuit held that no general maritime lien could attach under federal law. The Learned court then considered whether the insurers had a lien and privilege under the law of Louisiana. This lien too was denied because "the insurance written was for the sole and exclusive benefit of the owners of the steamboat, and in no wise inured to the benefit of the ship or maritime lienholders." *Learned*, 94 F. at 883.

Analysis of the question under the Federal Maritime Lien Act, James argues, leads to a different conclusion. James urges that in determining what constitutes a necessary under the Federal Maritime Lien Act, this court should apply the test that asks whether the furnished supplies or services are "reasonably needed in the ship's business." [3] James further suggests that Learned can be read narrowly as a decision of state law, not federal law, and therefore might not control the result in this case.

Equilease, on the other hand, argues on appeal that the federal maritime lien is a preferential one that should not be granted to those who advance premiums for marine insurance. In support of this position, Equilease first argues that because insurance is not physically delivered to the vessel, it is not "furnished" to the vessel within the meaning of 46 U.S.C. § 971.[4] Second, Equilease argues that neither general admiralty law nor the Federal Maritime Lien Act provides a maritime lien for unpaid insurance premiums because insurance is not a necessary for the benefit of the vessel. In support of this proposition, Equilease cites *Learned* and *Grow v. Steel Gas Screw Lorraine K*, 310 F.2d 547 (6th Cir.1962), and the rationale that a contract of insurance in no way aids the ship. Equilease's third argument is that James did not rely on the credit of the vessels when it advanced the insurance premiums, and therefore James may not claim a federal maritime lien. Equilease's final argument is that even if a maritime lien did arise in James' favor, the lien expired when James received payment from Borg-Warner in the

---

**3.** This is the test that has been articulated by two district courts. See *Layton Industries, Inc. v. Sport Fishing Cruiser Gladiator*, 263 F.Supp. 356 (D.Mass.1967); *Walker-Skageth Food Stores, Inc. v. The Bavois*, 43 F.Supp. 109 (S.D.N.Y. 1942).

**4.** 46 U.S.C. § 971 provides in full:
Persons entitled to lien

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

amount of the insurance premiums owed by Dunnamis. Equilease reasons that this payment in full to James extinguished any right that James had to assert a privilege.

To answer the question whether insurance is a necessary under the Federal Maritime Lien Act, we first examine briefly the history and nature of the federal maritime lien.

### III.

Under the FMLA, a maritime lien is established in favor of those who furnish "repairs, supplies, towage, use of drydock or marine railway, or other necessaries, to any vessel...." 46 U.S.C. § 971 (emphasis added).[5] Although maritime liens are to be strictly construed, the provision of necessaries for a vessel has long been recognized as the basis for a lien. *See Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200 (5th Cir.1979).

One purpose of the Ship Mortgage Act, 46 U.S.C. § 911, et seq. (1982), of which the Federal Maritime Lien Act is a part, was to establish sound security in favor of loans to ship owners. *Merchants & Marine Bank v. The T.E. Welles*, 289 F.2d 188 (5th Cir.1961); *First Suffolk National Bank of Huntington v. The Air Brant*, 125 F.Supp. 709, 710 (E.D.N.Y.1954). History shows that the merchant marine industry was faltering in 1910; Congress passed the Act in an attempt to spur incentive for the financing of shipowners by making private investment in shipping more attractive than it had been. The Act is essentially a compromise between two conflicting interests: that of the materialmen, who wanted an automatic and far-reaching lien, and that of the shipowners, who preferred never to have any lien attach. Gilmore and Black, The Law of Admiralty, at 653.

■ The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away. *Riffe Petroleum Co. v. Cibro Sales Corp.*, 601 F.2d 1385, 1389 (10th Cir.1979). The lien is a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim. The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds. *The Poznan*, 9 F.2d 838 (2d Cir.1925), rev'd on other grounds, sub nom *New York Dock Co. v. the Poznan*, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927). Thus the maritime lien may be defined as a property right that adheres to the vessel wherever it may go. *Pierside Terminal Operators, Inc. v. M/V Floridian*, 389 F.Supp. 25, 26 (E.D.Va.1974); *The Rupert City*, 213 F. 263, 267 (W.D.Wash.1914). Such a lien has been held to follow the vessel even after it is sold to an innocent purchaser. *The Joseph Warner*, 32 F.Supp. 532 (D.C.Ma.1939). The maritime lien is a lien on the vessel, "and only indirectly, inasmuch as it conflicts with the owner's rights in the vessel, it is connected with the owner." *Pierside Terminal Operators*, 389 F.Supp. at 26. The maritime lien concept thus somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner. *Todd Shipyards Corp. v. The City of Athens*, 83 F.Supp. 67 (Md.1949).

The second major purpose of the Federal Maritime Lien Act was to remove certain limitations on the right to liens and substitute a single federal statute for the statutes of the various states. *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920). Prior to the passage of the FMLA, a distinction had been drawn between a vessel in her home port and a vessel in a foreign port. A lien could be given for necessaries furnished to a vessel in a port of a foreign state if the necessaries were furnished upon the credit of the vessel. No such lien, however, was given for necessaries furnished in the home port or state. There also was a discrepancy among the court decisions as to when and under what

---

**5.** See footnote 4 for the text of section 971.

circumstances repair or supplies should be held to have been furnished relying on the credit of the vessel. *In re Burton S.S. Co.,* 3 F.2d 1015 (D.C.Mass.1925); *The Lucille,* 208 F. 424 (D.C.Ala.1913). With the creation of the federal maritime lien, a single federal statute is substituted for the state statutes insofar as they confer liens for repairs, supplies and other necessaries, and the old geographical distinctions are gone. *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California,* 310 U.S. 268, 272, 60 S.Ct. 937, 940, 84 L.Ed. 1197 (1940); *Piedmont,* 254 U.S. at 11, 41 S.Ct. at 4.

## IV.

■ The Act provides a right to a federal maritime lien to "any person furnishing repairs, supplies, . . . or other necessaries, to any vessel. . . ." 46 U.S.C. § 971. Equilease argues that the concept of "furnishing" requires a physical delivery to the vessel. Equilease's heavy reliance on a literal interpretation of the word "furnishing," however, is misplaced. To read "furnishing" as requiring an actual thing to be physically delivered to the vessel would foreclose any intangible services from ever being held necessaries under section 971. The term "necessary" under the FMLA includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged. 2 Benedict on Admiralty s 34 (7th ed. 1984). These "things" may be money, labor and skill, and personal services as well as materials. "It is the present, apparent want of the vessel, not the character of the thing supplied, which makes it a necessary." Id. As an example, we have held that printing for advertising is sufficient to give rise to a maritime lien. *Colonial Press of Miami, Inc. v. The Allen's Cay,* 277 F.2d 540 (5th Cir.1960). See also *Stern, Hays, & Lang, Inc. v. M/V NILI,* 407 F.2d 549, 551 (5th Cir.1969). What is a "necessary" is to be determined relative to the requirements of

the ship. 2 Benedict on Admiralty s 37 at 3–28. Anchors and cables are generally considered to be necessaries, but if the vessel is fully supplied with them, the furnishing of another anchor or cable is not "necessary." Id., § 34 at 3–19.

We find no persuasive reason to read the term "furnishing" so narrowly as Equilease would urge. The statute was intended to encourage private investment in the maritime industry. We will not begin now to defeat the purpose of the Act by layering technicalities onto its interpretation. We hold that "furnishing" in section 971 does not necessarily require an actual delivery of something to the vessel. That neither James nor the insurers physically delivered anything to any of Equilease's vessels does not bar James' claim to a lien.

## V.

■ Equilease next argues that no maritime lien arises in favor of James because insurance is not a "necessary" and therefore neither general admiralty law nor the Act provides a maritime lien for unpaid insurance premiums. Equilease relies on *Learned* and on *Grow v. Steel Gas Screw Lorraine K,* 310 F.2d 547 (6th Cir.1962), for this proposition. The Grow court stated in one sentence without elaboration that there is no federal maritime lien for insurance premiums, 310 F.2d at 549, and went on to grant the plaintiff insurance broker a lien under Michigan state law. Grow is thus not of much aid to us here. We focus instead on Learned.

As a mortgage creditor of the steamboat Liberty, Learned argued to this court in 1899 that policies of insurance on the Liberty were for the sole and exclusive benefit and use of the owners of the vessel, in no way inuring to the benefit of the ship itself. This court agreed with Learned and held that no lien arose on the vessel for premiums due on the insurance policies. The court reasoned that because the policies were solely for the benefit of the vessel's owners, they did not benefit the ship and

the ship could therefore not be held accountable for them.

Learned was based on an interpretation of state law prior to the passage of the Federal Maritime Lien Act. General maritime law in 1899 denied a lien for materials and services rendered in the waters of the vessel's home state. *The Roanoke*, 189 U.S. 185, 193, 23 S.Ct. 491, 492, 47 L.Ed. 770 (1903). Since the Liberty travelled only in a Louisiana bayou, it fell within this "home port" doctrine and no federal maritime lien could attach for insurance premiums or for any other supplies and materials furnished in the home port upon the credit of the owners. The Learned court also held that no lien arose in favor of the insurers, under either federal law or Louisiana law, because it deemed the insurance policy to be a contract "written for the sole and exclusive benefit of the owners of the steamboat." *Learned*, 94 F. at 883. See also The Prilla, 21 F.Supp. 383 (D.C.D.Ma. 1937); *The Wabash*, 279 F. 921 (D.C.D. Conn.1922). Equilease urges us to apply Learned and to find that marine insurance in 1986 inures solely to the benefit of a ship's owner, in no way aiding the ship, and therefore that no federal lien can be had for unpaid insurance premiums. This we cannot do.

In the nineteenth century, an insurance policy on a ship was viewed as a contract for the personal indemnity of the insured ship's owner. Under this reasoning, no lien against the ship itself could possibly arise as the result of an insurance policy; "[u]nless the ship is benefitted the ship should not pay." *In Re Petition of Insurance Co. of Pennsylvania*, 22 F. 109, 116 (N.D.N.Y.1884), aff'd sub nom. *Insurance Co. of Pennsylvania v. The Proceeds of the Sale of the Barge Waubauschene*, 24 F. 559 (C.C.N.D.N.Y.1885). It is no longer appropriate, however, to view maritime insurance this way. Even a vessel that simply sits at a dock without making any attempt to ply the waters must today have hull protection and indemnity insurance. As the district court noted, insurance is something that every vessel today needs just to carry on its normal business. *Equi-*

*lease*, 568 F.Supp. at 1263. Equilease itself required all of its affiliate companies to carry adequate insurance and would not do business with any company that failed to do so. *Equilease*, 568 F.Supp. at 1263. The Bareboat Charter Party entered into by the Equilease "shelf" corporations with Dunnamis required that throughout the term of the charter, "the charterer shall, at his own expense, keep the vessel insured against ... risks ... in an amount ... not less than the greater of the initial cost of the vessel or the full commercial value of the vessel...." The agreement specifically required insurance coverage for property damage, personal injury and death to third parties and crew, breach of warranty, pollution, cargo and tower's liability, and provided that war risk hull and indemnity insurance would be required at the owner's discretion. The Charter Party also mandated that any insurance payments for losses greater than $10,000 (but less than total loss of the vessel) were to be made to the owner, or to a designated mortgagee, who was required to apply such funds directly for repairs, liabilities, salvage claims, or other charges and expenses, or to reimburse the charterer for any money he had advanced for repairs and claims covered by the policy. In the light of this type of agreement, the nineteenth century view of marine insurance as an optional contract, entered into by a shipowner at his own discretion solely for his own personal indemnity, must fade into the shadows of history.

We therefore hold that because insurance is essential to keep a vessel in commerce, insurance is a "necessary" under 46 U.S.C. § 971 and unpaid insurance premiums to give rise to a maritime lien under the FMLA.

This determination, however, does not resolve the case before us. Our holding recognizes that a federal maritime lien may have arisen against the vessels in James' favor for the balance of the insurance premiums that Dunnamis failed to pay. The question remains whether James has met

the other statutory requirements of the lien.

### VI.

Equilease insists that for James to claim a right to a federal maritime lien, it must have relied on the credit of the vessels when it furnished the insurance. Equilease points to evidence and testimony in the record indicating that James relied solely on the credit of Equilease, Dunnamis, and Eltra Corporation, the owner of Equilease, and argues that James has no right to assert the lien. For the proposition that a creditor who relies solely on the credit of one other than the vessel may not claim a federal maritime lien, Equilease cites *W.A. Marshall & Co., Inc. v. The President Arthur,* 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846 (1929), and *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield,* 658 F.2d 363 (5th Cir.1981).

Equilease's argument at first appears to be contrary to the express language of the FMLA. Section 971 provides that "it shall not be necessary to allege or prove that credit was given to the vessel." Examination of the history of the principles and a study of the cases interpreting the statute, however, reveal the merits of Equilease's argument.

Prior to the initial passage of the Act, 36 Stat. 604, the law was settled that a federal maritime lien could arise only for necessaries furnished in reliance upon the credit of the vessel. Credit to the ship, as distinguished from credit to the owner, was essential to the existence of a maritime lien. *The St. Jago de Cuba,* 22 U.S. (9 Wheat.) 409, 6 L.Ed. 122 (1824). Because the lien arose against the ship and gave the lienor a right to seize the ship upon process of the admiralty court, such a drastic remedy was to be made available only to creditors who had relied on the credit of the ship itself. If the goods or services had instead been furnished in reliance upon the credit of the owner or a third party, then the creditor had recourse for the debt other than against the vessel itself, and no lien would arise.

When the FMLA was passed in 1910, a debate arose among the courts about the interpretation to be given the phrase concerning credit to the vessel. The cases interpreting the Act immediately after its passage did not even consider the possibility that Congress had intended to dispense with credit to the ship as a prerequisite to the lien. Gilmore and Black, The Law of Admiralty at 665–66. Then in 1920 two relevant events occurred: Congress re-enacted the Act as part of the Ship Mortgage Act without amending this provision, and the Supreme Court decided *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, settling the debate. Piedmont held that the relevant language in the Act served only to remove from the creditor the burden of proving that he had relied on the credit of the vessel. The presumption that the vessel's credit was relied upon, a presumption formerly available only to creditors furnishing necessaries to a vessel in a port or jurisdiction foreign to it, *see* Gilmore and Black, The Law of Admiralty at 664–65, was not granted to "[a]ny person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic...." 46 U.S.C. § 971.

Despite the language of the Act, the idea of credit to the vessel being a prerequisite to a lien, and the concomitant principle that credit to the owner negates the lien, are still very much with us today. Thus, under section 971, a presumption arises that one furnishing supplies to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charterer was solely relied upon. *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta,* 696 F.2d 1135, 1139 (5th Cir.1983); *General Electric Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 814 (5th Cir.1982); *see also Sasportes v. M/V Sol de Copaca-*

*bana*, 581 F.2d 1204, 1209 (5th Cir.1978).[6] To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien. *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743, 750 (5th Cir.1985); *TTT Stevedores*, 696 F.2d at 1139; *Farrell Ocean Services, Inc. v. United States*, 681 F.2d 91, 93–94 (1st Cir. 1982); *Gulf Trading & Transportation Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 368 (5th Cir.1981); *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 867 (5th Cir.1958). Because of the strong presumption in favor of a maritime lien, it is necessary that a party opposing the lien prove that the creditor, in this case James, deliberately intended to look solely to the owner's personal credit and to forego the valuable privilege afforded it by law. *Gulf Oil Trading*, 757 F.2d at 750.

■ Because it relied on *Learned v. Brown* and found that no federal maritime lien had arisen in James' favor, the district court did not make a finding as to what credit James relied upon in advancing the insurance premiums. Equilease argues, however, that there is uncontradicted evidence in the record that James did not rely on the credit of the vessel when it advanced the monies for the insurance premiums. William Keith Hargrove, former manager of James' Marine, Oil and Gas Department, who handled the Equilease and Dunnamis accounts, testified at trial that James had relied on the credit of Equilease and Dunnamis. Hargrove was asked on cross-examination, "What did you rely on for payment of those insurance premiums? ... Who or what did you rely on?" He responded that it had been James' understanding "from the very beginning" that Equilease, whether directly or indirectly, was being relied upon, in that James was receiving money from Dunnamis that had been furnished to Dunnamis by Equilease. When the cross-examiner probed, "So you are saying you relied only on Dunnamis, Equilease, and/or Eltra, is that a fair statement?" Hargrove replied, "That's a fair statement."[7] James itself states in its original brief filed in this court: "The Unilease Companies were totally funded for the operations of the Vessels by Equilease and it was the credit of Equilease upon which all parties placed total reliance."[8] James contests this showing only by quoting a general statement made by Hargrove on direct examination—"There is no intent for us to give up anything"—and by alleging that Equilease has not adduced enough evidence of James' reliance on someone or something other than the vessels to show that James waived its lien.

We find that the relevant parts of the transcript and record make it clear that James did not rely on the credit of the insured vessels when advancing the money for the premiums, but rather relied on the credit of Equilease and Dunnamis. The uncontradicted testimony and the concession made by James in its brief overcomes the presumption that James relied on the credit of the vessel.[9] We find no evidence

---

6. "[U]ntil there is a proper denial with supporting proof to the contrary, the presumption is that the goods were furnished on the credit of the vessel." *Colonial Press of Miami, Inc. v. The Allen's Cay*, 277 F.2d 540, 541 (5th Cir.1960).

7. Eltra Corporation was Equilease's owner at the time.

8. The dissent implicitly acknowledges this unrefuted testimony that reliance for payment of the debts was placed altogether on other sources. The dissent places the words of the witness in the fuller context of his entire testimony, but their impact remains unchanged. Whether this testimony is placed in full context or excerpted, the point is clear: in advancing payment for the insurance premiums, the credit of the vessel was not considered in the slightest, and not having been considered, there plainly could have been no reliance.

9. The dissent argues that the question is not whether James consciously relied on the credit of the vessel. Rather, the dissent insists that "the question which should be asked is whether the record compels the inference that James deliberately or purposefully intended to forego its right to a lien." The answer to the question is, yes. First, in the absence of reliance—intentional, by presumption, or otherwise—there is no right to claim a lien; in different words, if one purposefully foregoes reliance on the credit

that James conducted its business with Equilease and Dunnamis in such a way as to preserve a federal maritime lien.[10] Because James did not rely on the credit of the vessels, either wholly or in part, it may not claim a federal maritime lien for the unpaid insurance premiums.[11]

## VII.

Accordingly, *Learned v. Brown*, 94 F. 876, is overruled. Marine insurance on vessels is a necessary under the Federal Maritime Lien Act and unpaid insurance premiums may give rise to a federal maritime lien in favor of the insurer. James, however, is denied a federal maritime lien because it has been shown to have not relied on the credit of the vessels when it advanced the insurance premiums. The district court is

REVERSED.[12]

W. EUGENE DAVIS, Circuit Judge, with whom RANDALL and PATRICK E. HIGGINBOTHAM, Circuit Judges, join, concurring in part and dissenting in part:

We took this case en banc to decide whether insurance is a "necessary" so that the supplier of insurance is entitled to a maritime lien for insurance premiums under the Maritime Lien Act. I concur in the majority's affirmative answer to this question and the clear persuasive reasons advanced in support of this rule.

I thoroughly disagree, however, with the court's holding that James, who supplied the insurance, did not, as a matter of law, rely on the credit of the vessel and thus waived his lien. This conclusion is bottomed on a finding that James relied on the credit of the vessel owner and others without consciously considering whether he would lien the vessel if the owner defaulted. In holding that this is sufficient to rebut the presumption of reliance by a supplier on the credit of the vessel, the court, without a word of disapproval, overrules at least twenty-five years of established law in this circuit and creates serious practical problems in the enforcement of maritime liens.

### I.

Before the adoption of the Maritime Lien Act (lien act), a supplier who claimed a lien for necessaries furnished to a vessel in her home part was required to establish his reliance on the credit of the vessel as an essential element of the lien. G. Gilmore & C. Black, The Law of Admiralty, § 9–37 (2d ed. 1975). The circuits were split, however, as to whether the materialman asserting a

of the vessel, it is tantamount to purposefully foregoing the right to claim a lien against the vessel. Thus, when James deliberately chose not to rely on the credit of the vessel, as a matter of law it purposefully intended to forego its right to claim the lien.

**10.** Indeed, James could not have reasonably expected to have relied on a federal maritime lien, because until today, this circuit recognized no such lien in favor of a creditor who advances insurance premiums.

**11.** James also claims that if it is denied a lien, it should be able to collect the unpaid insurance premiums from Equilease as restitution under a contract theory of unjust enrichment. Recognizing that this court has subject matter jurisdiction in admiralty to hear this claim, see *International Sea Food Ltd. v. M/V Campeche*, 566 F.2d 482, 485 (5th Cir.1978) ("that marine insurance is a maritime contract within the jurisdiction of an admiralty court has long been settled"), we find James' argument meritless. Unjust enrich-

ment is an equitable remedy to be invoked only when there is no available remedy at law. *Fidelity & Deposit Co. of Maryland v. Smith*, 730 F.2d 1026, 1030 (5th Cir.1984); *Austin v. North American Forest*, 656 F.2d 1076, 1088–89 (5th Cir.1981). Because James has a remedy at law in an action available against Dunnamis, its claim for equitable restitution cannot be entertained.

**12.** The dissent predicts that our decision, allowing a competing creditor to defeat a lien by showing that the claimant did not rely on the credit of the vessel, will create special trial problems. We do not foresee special problems. In such cases, there usually will be a clear and routinely resolved question before the court: does the evidence show that the credit of the vessel was not relied upon to any extent? If competent and credible evidence proves that the claimant did not rely to any extent on the credit of the vessel, then the right to claim a federal maritime lien against the vessel will be defeated.

lien under state statute had the burden of establishing reliance on the credit of the vessel. Id. The lien act contains two provisions relevant to this reliance on the credit of the vessel element of the lien. The first, section 971 (46 U.S.C. § 971), provides that "it shall not be necessary to allege or prove that credit was given to the vessel." The second relevant provision of the lien act, section 974 (46 U.S.C. § 974), provides that nothing in the act should be construed to prevent a supplier of necessaries from waiving his right to a lien "by agreement or otherwise."

Following the adoption of the lien act, the Supreme Court in *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), held that the effect of the lien act was to give the materialman the benefit of a presumption that he relied on the credit of the vessel when he furnished necessaries. The law has been exceedingly clear in this circuit, at least since 1958, that this presumption is a strong one that may be rebutted only by showing that the supplier intentionally relinquished his right to a lien. We have consistently rejected the argument that reliance by the supplier on the personal credit of the vessel owner or charterer is sufficient to rebut that presumption.

In *Point Landing, Inc. v. Alabama Dry Dock*, 261 F.2d 861 (5th Cir.1958) the supplier of a new engine for the vessel took a note from the vessel owner, a chattel mortgage on the vessel and a mortgage on the vessel owner's real estate to secure the indebtedness for the engine. The vessel owner argued that no lien arose because the note obtained from the owner, along with the conventional security devices to secure that note, reflected that the supplier relied on the credit of the owner rather than the vessel. This argument was soundly rejected. Judge Brown, speaking for the court, announced a rule that has been consistently followed: "In a proper case it might well be that all such acts, with other convincing testimony deemed sufficient to establish it by a preponderance of the evidence, might permit the in-

ference that the supplier purposefully intended to forego the valuable privilege which the law accords and look solely to the owner's personal credit. Here, there was no such proof." 261 F.2d at 867 (emphasis added).

In *Gulf Trading & Transportation Co. v. The Vessel HOEGH SHIELD*, 658 F.2d 363 (5th Cir.1981), cert. denied, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982), the shipowner argued that the lien had been waived because the supplier dealt with the charterer of the vessel and had no contact with the vessel owner. The court concluded "[w]e agree with Gulf that when the transaction is considered as a whole, nothing was purposely done by Gulf to waive the maritime lien that arose as a matter of statutory law upon the furnishing of bunker fuel to the vessel in a United States port." 658 F.2d at 368. (emphasis added)

In a very recent case, *Gulf Oil Trading Co. v. M/V CARIBE MAR*, 757 F.2d 743 (5th Cir.1985), we held that the supplier of bunkers had not waived its maritime lien even though the fuel was sold to the charterer which had enjoyed a long business relationship with the supplier and had a fixed dollar line of credit with the supplier. We stated "[b]ecause of the strong presumption in favor of a maritime lien, we have consistently held that it is necessary that a litigant arguing for such a waiver prove that the creditor deliberately intended 'to forego the valuable privilege which the law accords and look solely to the owner's personal credit.'" 757 F.2d at 750 (emphasis in opinion at p. 750). To the same effect, see *Sasports v. M/V SOL DE COPACABANA*, 581 F.2d 1204, 1209–10 (5th Cir.1978); *TTT Stevedores of Texas, Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 (5th Cir.1983). See also *Farrell Ocean Services, Inc. v. United States*, 681 F.2d 91, 93–94 (1st Cir.1982).

Gilmore & Black, after a thorough discussion of the background of this defense to the assertion of a maritime lien, states: "... the presumption that the lienor relied

on his lien has become all but conclusive." G. Gilmore & C. Black, The Law of Admiralty, § 9–38, (2d ed. 1975).

## II.

The majority cites three sources in the record that it finds sufficient as a matter of law to establish that James waived its lien.

First, the court points to the cross-examination of James' marine manager, Mr. Hargrove. Before the testimony was given that is relied upon by the court, counsel questioned Hargrove closely about why James did not require either Equilease or Eltra to sign the Borg-Warner note along with Dunnamis. Counsel then attempted to learn from Mr. Hargrove the identity of the person in the James organization who made the decision to extend credit for the insurance sold on the vessels in question. Hargrove responded that James thought the bill for the insurance premiums would be paid promptly and that a credit transaction was not intended. The series of questions that culminated in the answer relied on by the majority then followed.[1] Nowhere in this line of questioning did counsel refer to the liability of the vessel or the willingness of James to enforce a lien if the law gave him one. In sum, Hargrove testified that James, as the insured's broker, advanced the premiums in the belief that Eltra or Equilease, two corporations with substantial assets, would see that Dunnamis reimbursed James in the normal course of business. Hargrove was not asked whether he intended to assert a lien against the vessel if the premiums were not paid, but under these circumstances it is reasonable to infer that he did not consider what collection steps he would take if James' invoice was not paid. As the majority acknowledges, Hargrove did state that he did not intend to give up any right.

The statement in James' brief[2] relied on by the majority in support of its finding that James waived the lien appears in the portion of James' brief dealing with the validity of Equilease's mortgage on the vessel. James was attempting to make the point in this passage of its brief that Dunnamis was a shell corporation acting as agent for its dominant parent, Equilease, the party that funded the entire operation and on whose reputation and credit all parties relied.

The most that can reasonably be inferred from Mr. Hargrove's testimony and the above sentence from James' brief is that James relied on the personal credit of Dunnamis, Equilease and Eltra and no consideration was given to collection procedures that might be followed in the event of default. The record evidence does not suggest any reason James would relinquish his right to a lien and Mr. Hargrove's testimony that James did not intend to give up this right is completely credible. In my view, the record evidence relied on by the majority falls far short of supporting a finding that James intentionally relinquished his right to a lien.

---

1. Q. Mr. Hargrove, what did you rely on for payment of those insurance premiums?
A. Now, why we allowed the premiums to go as long as they did?
Q. No, sir. What did you rely on for payment of those insurance premiums?
A. I still don't understand your question. I mean, who—
Q. Who or what did you rely on?
A. It was our understanding from the very beginning that Equilease, whether directly or indirectly, and at that time we understood the money was to be given to Dunnamis, we were receiving money from Dunnamis, which was money furnished by Equilease.
Q. So—
A. And again, that's why we allowed the receivables to go as long as they did without payment.

I mean, under normal course of business, if it had not been Eltra, Equilease, we would have cancelled that policy a long time prior to the July 20th renewal.
Q. So you are saying you relied only on Dunnamis, Equilease and/or Eltra, is that a fair statement?
A. That's a fair statement.

2. The Unilease Companies stand in the same position as a general agent for the operations of the Vessels on behalf of Equilease. There was the requisite mutual inter-dependence on the financial credit and stability of each of the parties. The Unilease Companies were totally funded for the operations of the Vessels by Equilease and it was the credit of Equilease upon which all parties placed total reliance.

The majority cites an additional reason why James waived his lien: Until today, the law in this circuit did not allow a lien to one providing insurance, so James had no right to rely on the vessel to pay the debt.

Although the significance of this fact is not explained by the majority, I do not read the opinion to hold that James is not entitled to the change in the law we announce today. It would be novel indeed to hold that the litigant who blazed the trail and persuaded the court to change the law is not entitled to the benefit of that change.

The record does not establish that Mr. Hargrove or anyone else with James knew that James was not entitled to a lien under the law of this circuit when the insurance was furnished. Without proof of such knowledge by James, I fail to see how it can be said that James intentionally relinquished the lien by furnishing necessaries with knowledge that no lien would accrue.

In resolving this issue, the majority seeks to answer the following question: Did James consciously rely on the credit of the vessel when he supplied the insurance. I have no quarrel with the negative answer to that question; it is simply the wrong question. The question which should be asked is whether the record compels the inference that James deliberately or purposefully intended to forego his right to a lien. The record in my view does not support—much less compel—such an inference.

### III.

I am persuaded that the rule adopted by the majority will have several untoward consequences in maritime lien litigation. First, an inordinate amount of unproductive trial time will be expended trying to divine the subjective thoughts of the supplier as to whether he considered at the time of the sale whether he would lien the vessel if his bill was not paid. If the supplier is a large concern with distinct sales and credit departments the subjective intent of several persons may be relevant. The small unsophisticated supplier uninformed about liens and unaware that his services or sup-plies give rise to a maritime lien will face a serious problem. According to the majority, such a supplier who has no knowledge that the vessel is liable for the debt and thus does not rely on the credit of the vessel waives his lien. Many of the larger firms will incorporate language in their invoices that will negate any intent to waive the lien. But the less sophisticated individuals and small suppliers—who need lien protection the most—will frequently lose their lien.

### IV.

The holding of the majority that James lost its lien because it did not rely on the credit of the vessel is premised on an erroneous interpretation of the Lien Act. In my view, this holding will have the effect of advancing form over substance and creating unnecessary uncertainty, confusion and litigation in this important area of commercial law. For these reasons, I respectfully dissent from this feature of the court's opinion.