FOSS LAUNCH & TUG CO., et al.,
Plaintiffs,

and

Transamerica I.C.S. Inc. and Nautilus
Leasing Services, Inc.

and

Flexi-Van Leasing, Inc.,
a corporation,

and

Itel Containers International
Corporation and Genstar
Container Corporation,

and

Interpool Limited,
Plaintiffs-Appellees,

v.

CHAR CHING SHIPPING U.S.A., LTD.,
et al., Defendants,

and

Char Yigh Marine (Panama,) S.A. claim-
ant of vessel M/V C.C. SAN FRANCIS-
CO, her engines, boiler, tackle, appurte-
nances, furniture and fixtures, in rem,
Defendant-Appellant.

No. 85–6351.

United States Court of Appeals,
Ninth Circuit.

Jan. 20, 1987.

As Amended Feb. 5, 1987.

William F. Daley, Jr., Long Beach, Cal., James B. Nebel, Graham & James, San Francisco, Cal., Ronald D. Kent, Gerald M. Fisher, Fisher, Porter & Kent, Long Beach, Cal., for plaintiffs-appellees.

David E. R. Woolley, Lillick, McHose & Charles, Los Angeles, Cal., for defendants-appellants.

Before GOODWIN, WALLACE and ANDERSON, Circuit Judges.

GOODWIN, Circuit Judge.

The only substantial question in this appeal is whether a lessor of container boxes to a company that operates a fleet of container ships can assert a maritime lien against a vessel pursuant to 46 U.S.C. §§ 971–975. The district court granted summary judgment for the lien claimant. We reverse.

The essential facts are not in dispute. Appellees leased containers to CC Line under a series of separate lease agreements. The containers were to be used by CC Line in connection with its transpacific shipping service between various ports in Asia and the United States. Under the lease agreements, containers were delivered to CC Line at different times in a variety of locations. The containers are substantially uniform in design and construction, and are treated by carriers as fungible. Some deliveries under the Flexivan agreements were apparently made to CC Line's own container yards that service its transpacific operations. The Transamerica, Nautilus,

Genstar, and Itel leasing contracts, however, provided for the delivery of containers to CC Line at container manufacturing plants and at the lessor's own container depots. Once the CC Line took possession of the containers, CC Line had unrestricted authority to designate which containers would be placed aboard the particular vessels operating in its transpacific service.[1] The lease agreements likewise did not restrict the use of the leased containers to exclusive use in maritime transportation. These boxes are designed for intermodal transportation.

The vessel "C.C. San Francisco" entered CC Line's transpacific service in 1983. It was specially designed for carrying cargo packed in containers. One or more of each lessor's containers was actually used aboard the "C.C. San Francisco" for the transport of ocean cargo.

In late August, 1984, the vessel "C.C. San Francisco" was arrested in Los Angeles in an *in rem* maritime action by appellees. The registered owner of the vessel, "Char Yigh Marine (Panama) S.A.," thereafter appeared in district court and sought a post-seizure hearing to have plaintiffs-appellees justify their maritime lien claims. Cross-motions for summary judgment were filed with the district court and on August 20, 1985, the district court ruled in favor of plaintiffs' liens. The district court held: (1) that the plaintiffs' container leases with "CC Line" are maritime contracts; (2) that plaintiffs' containers served as the functional equivalent of the hold of the "CC San Francisco" and are therefore "necessaries" within the meaning of 46 U.S.C. § 971; (3) that plaintiffs "furnished" containers to the "CC San Francisco" within the meaning of 46 U.S.C. § 971; (4) that plaintiffs have valid maritime liens for necessaries against the vessel "CC San Francisco" for all containers carried aboard that vessel; and (5), that the maritime lien encompasses

---

1. This practice is apparently consistent with the current industry practice with respect to containerization. Containers are leased in bulk lots so that they can be employed interchangably or sequentially in the conveyance of freight by means of various modes of transport including ships, airplanes, railroads, and trucks.

all periods plaintiffs' containers served as the functional equivalent of the hold of the "CC San Francisco," including incidental land use.

*Flexivan Leasing, Inc. v. M/V C.C. San Francisco*, 628 F.Supp. 1077, 1080 (C.D. Cal.1985).

■ Appellants raise a number of issues on appeal. The first issue is whether the district court had admiralty jurisdiction. Disputes involving the interpretation of contractual duties in maritime contracts can be proper subjects for resolution in admiralty. *Hinkins Steamship Agency, Inc. v. Freighters, Inc.*, 498 F.2d 411, 412 (9th Cir.1974) (per curiam) (contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, is subject to maritime law and falls under admiralty jurisdiction). We have no difficulty in following the cases which have found similar container leases to be sufficiently related to maritime transportation to support the extension of federal admiralty jurisdiction. *CTI–Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380–81 (2d Cir.1982); *American President Lines, Ltd. v. Green Transfer & Storage, Inc.*, 568 F.Supp. 58, 60 (D.Or. 1983); *Integrated Container Service, Inc. v. Starlines Container Shipping, Ltd.*, 476 F.Supp. 119, 125 (S.D.N.Y.1979).[2]

Of the remaining issues raised on appeal, each turns on an interpretation of the governing federal maritime lien statute, 46 U.S.C. § 971. That statute provides as follows:

> Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem,

and it shall not be necessary to allege or prove that credit was given to the vessel. 46 U.S.C. § 971 (1982).

■ A recent decision of this court, *Farwest Steel Corp. v. Barge Sea-Span 241*, 769 F.2d 620, 623 (9th Cir.1985), instructs that there are three requirements for the grant of a maritime lien under 46 U.S.C. § 971. A person lien claimant must have: (1) furnish[ed] repairs, supplies, or other necessaries, (2) to any vessel, (3) "upon the order of the owner of such vessel, or of a person authorized by the owner." 46 U.S.C. § 971.

The "necessaries" requirement presents no substantial difficulty. The term, in modern interpretations, has been expanded to encompass any item which is "reasonably needed for the venture in which the ship is engaged." 2 S. Friedell, S. Bellman, A. Jenner & J. Loo, *Benedict on Admiralty* § 37 at 3–27 (7th ed. 1986). *See also Farwest Steel Corp.*, 769 F.2d at 623 ("[t]he term 'necessaries' under section 971 refers to 'supplies which are necessary to keep the ship going' ").

The wide range of items that can be characterized as "necessaries" under the Act is exemplified by the result in *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, (5th Cir.1986) (en banc). In *Equilease*, the court stated: "The term 'necessary' under the FMLA [Act] includes most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function.... What is a 'necessary' is to be determined relative to the requirements of the ship." *Equilease*, 793 F.2d at 603 (citations omitted). The court's resulting conclusion was that "because insurance is essential to keep a vessel in commerce, insurance is a 'necessary' under 46 U.S.C. § 971." 793 F.2d at 604.

■ During all relevant periods of the operations of the "C.C. San Francisco," car-

---

**2.** We express no opinion on the effect of "incidental land uses" of containers employed in "inter-modal" freight conveyance, originating on maritime vessels, upon the proper boundaries of admiralty jurisdiction. We need not decide whether a creditor could permit maritime attachment of containers located far in the interior of the country even though they may have been subject to the preference accorded maritime liens while aboard ship.

go containers of the type leased by appellees were more than reasonably necessary to the successful operation of the vessel. Although theoretically it might have been possible to convert the "C.C. San Francisco" from a container carrier to another type of cargo vessel, such transformation or modification was not attempted here. The vessel entered service in 1983 designed to transport cargo containers of the type supplied by appellees. It was engaged in container shipping throughout its time-charter period of operation by CC Line. We therefore hold that containers provided to the "C.C. San Francisco" under the leasing agreements were "necessaries" within the meaning of 46 U.S.C. § 971.[3] *Accord Transamerica ICS, Inc. v. M/V Panatlantic,* 1984 A.M.C. 489, 490 (S.D.Fla.1983) ("the Court is convinced that containers are 'necessaries' within the meaning of 46 U.S.C., sec. 971"); *Nautilus Leasing Services, Inc. v. M/V Cosmos, et al.,* 1983 A.M.C. 1483 (S.D.N.Y.1983) ("we have no difficulty holding that the containers in the instant case are 'necessaries' within 46 U.S.C., sec. 971").

The third requirement, that items be furnished to a vessel under the direction of an "owner" or "authorized person" can also be easily addressed. It is now well established that a bareboat time-charterer of a vessel holds sufficient legal authority over the management of the vessel to subject the vessel to maritime liens. *Gulf Trading & Transportation Co. v. M/V Tento,* 694 F.2d 1191, 1194 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983). The 1971 amendments to the Federal Maritime Lien Act, *see* H.R.Rep. No. 92–340, 92nd Cong., 1st Sess. 1, 3, *reprinted in* 1971 U.S.Code Cong. & Admin.News 1363, 1365, were also partly intended to ensure that any person to whom the management of a vessel is entrusted will be presumed to have authority to procure necessaries and supplies which may give rise to maritime liens. 46 U.S.C. § 973; *Farwest Steel Corp.,* 769 F.2d at 623–24.

■ In this action, no extraordinary circumstances have been put forward to suggest that CC Line was not in fact entrusted with management authority over the "C.C. San Francisco" during relevant periods of its operation. Accordingly, we hold that the appellees entered into container leases with a party adequately authorized by the owner of the vessel "C.C. San Francisco" to support a grant of maritime liens under 46 U.S.C. § 971.

The second requirement, that the lien claimant be a person "furnishing ... to any vessel," presents a closer question. Its resolution turns on the intent of Congress in drafting a form of the verb "to furnish" into the text of 46 U.S.C. § 971. There is no doubt that containers furnished by the lien claimant were carried on one of a group of vessels intended to carry such containers. The question is whether the lien claimant furnished the attached containers "to" that vessel under the Act. In other words, is it a condition precedent to a lien that containers which have been leased to managers of a fleet of container vessels also must have been specifically set apart for use on the particular vessel against which a lien is asserted?

The "furnishing" question has recently been faced in two other circuits. Apparently in an effort to accommodate the professed expectations and needs of the shipping industry, each court applied a broad construction of "furnishing." In the most recent decision, the Fifth Circuit noted the closeness of the question but nevertheless concluded: "We find no persuasive reason to read the term 'furnishing' ... narrowly.... The statute was intended to encourage private investment in the maritime industry. We will not begin now to defeat

---

**3.** We note without deciding that proof of excess leasing of containers in relation to the capacities of a single vessel or fleet of vessels might undermine a materialman's claim to having furnished "necessary" items to a vessel. *See, e.g., Bellingham Nat. Bank v. Oil Screw Pacific Hori-* *zon,* 587 F.Supp. 26 (W.D.Wash.1984) (materialman did not "furnish" a fishing net to a particular ship because the net was originally "furnished" for a different ship and then subsequently transferred to the liened ship).

the purpose of the Act by layering technicalities onto its interpretation." *Equilease,* 793 F.2d at 603. Similarly, a Florida district court noted that "for purposes of creating a valid maritime lien, it may not be essential, and indeed may not be desirable, that the container be delivered directly to the vessel, be sold rather than leased, or be earmarked for a particular vessel." *Transamerica ICS,* 1984 A.M.C. at 490.

We respect the reasoning of these courts. But we are reluctant to subject the heretofore relatively certain law of maritime liens to the uncertainty and flux of developing shipping industry practices when the controlling precedents governing interpretation of the Act favor a narrow construction of the "furnishing" requirement.

We begin with the plain meaning of 46 U.S.C. § 971. Stripped to its essentials, the statute states that "[a]ny person furnishing ... necessaries ... to any vessel...." We note initally that the verb "to furnish" as found in the statute appears in the form of the active and not the passive voice. For example, the statute could have been drafted to state that "necessaries that *are furnished* to any vessel" can support a maritime lien. In such circumstance, it would have been possible for even the fortuitous application or use of necessaries by a vessel to create a valid maritime lien against a vessel. In creating a preferred class of secured creditors, Congress chose not to draft the Act in the passive voice and we think the correct inference is that Congress intended "furnishing" to require active forethought or advance identification of particular vessels in relation to "necessaries" supplied.

■ This inference is consistent with the historical vessel-specific character of a maritime lien. Under the law of maritime liens, a vessel is considered to be a distinct entity responsible only for its own debts. *Riffe Petroleum Co. v. Cibro Sales Corp.,* 601 F.2d 1385, 1389 (10th Cir.1979). As a consequence, maritime liens are enforced through in rem proceedings, *see* Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims, Fed.R.Civ.P., and jurisdiction lies only in the district where the vessel is located.

Our restrictive interpretation of "furnishing" is supported by longstanding precedents interpreting 46 U.S.C. § 971. *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), and its progeny are particularly apposite to this action. In *Piedmont,* the Supreme Court denied maritime liens sought against vessels that had received coal which had been sold to the vessels' owner on credit. The defect was not "in failure to show that the coal was furnished *to* the vessels but in failure to prove that it was furnished *by* the libelant." *Piedmont,* 254 U.S. at 13, 41 S.Ct. at 5.

Appellees contend that *Piedmont* represents a case driven by a simple failure of proof as to the amounts of coal actually received by each vessel in a group of vessels supplied with coal. However, it is clear that *Piedmont* has not been interpreted in such a limited fashion. In *Bankers Trust Co. v. Hudson River Day Line,* 93 F.2d 457 (2d. Cir.1937), maritime liens were denied a supplier of oil who had delivered oil to a buyer's barges under a *single bulk* supply contract. In denying the lien, the *Bankers Trust* court understood the holding of *Piedmont* on the "furnishing" question to require that "supplies, though delivered in mass to the owner of the fleet under a single contract, [must be] expressly ordered by the owner and delivered to him by the supplyman for the use of *named vessels in specified portions.*" *Id.* at 458 (emphasis supplied by Second Circuit) (*quoting The American Eagle,* 30 F.2d 293, 295 (D.Del.1929)).

In *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268 (1940), the Supreme Court decided to grant a maritime lien only after distinguishing *Piedmont* in the following manner: "In the instant case, the oil was supplied exclusively for the vessels in question, was delivered directly to the vessels and was so invoiced; and there was nothing in the general con-

tract to the effect that the supplies were to be furnished [to some degree] upon the credit of the vessels." *Id.* at 277. Thus, the holding of *Dampskibsselskabet* should be read to encompass only those cases in which a materialman has taken care, in an ascertainable manner, to designate the items or services he contracts to provide for use on the particular vessel against which a lien is subsequently sought. *See also The Everosa*, 93 F.2d 732, 735 (1st Cir.1937) (lien granted) ("In the present case, the master of a particular vessel requisitioned for coal to the coal company; it was sent to a particular vessel, loaded on her by the coal company's representative and paid for by her master"); *Carr v. George E. Warren Corp.*, 2 F.2d 333, 334 (4th Cir.1924) (lien granted) ("In this case, the coal was actually purchased on the credit of the steamers, billed to the steamers, and used by them.")

*Piedmont* was also responsible for the incorporation of the *stricti juris* principle, long a feature of the law of maritime liens, *see Vandewater v. Mills*, 60 U.S. 82, 19 How. 82, 89, 15 L.Ed. 554 (1857), into the law governing the interpretation of maritime liens under the Act. *Piedmont*, 254 U.S. at 12, 41 S.Ct. at 4. Because the maritime lien under 46 U.S.C. § 971 is secret and may operate to the prejudice of prior mortgagees and other creditors without notice, it will not be "extended by construction, analogy or inference." *Id.; See also W.A. Marshall & Co. v. S.S. "President Arthur"*, 279 U.S. 564, 568, 49 S.Ct. 420, 421, 73 L.Ed. 846 (1929); *Bankers Trust Co.*, 93 F.2d at 459; *Bellingham Nat. Bank*, 587 F.Supp. at 28–29.

The facts and posture of the instant action parallel those found in *Piedmont*. In each case a materialman provided bulk supplies—coal in *Piedmont*, containers here—in circumstances where the final allocation of supplies, to any vessel of the group intended to be supplied, was left to the discretion of the procuring authority. Although, in both cases, it was understood that the supplies provided would predominantly be put to maritime use, in neither case was there any evident attempt to designate any individual vessel to receive any identifiable component of the supplies.

Appellees vainly attempt to distinguish *Piedmont*. First, they contend that their ability to identify precisely which containers were carried on board the "C.C. San Francisco" at which time adequately answers the concern in *Piedmont* over the grant of equally proportional liens against each of the vessels in the group that received coal. However, this is simply not a distinguishing characteristic. The *Piedmont* holding was not made contingent on the district court's inability to establish the exact amount of coal used by a particular vessel in the group. Rather, the defect was in the unstructured character of the contractual arrangements for the supply of coal to the *Piedmont* vessel group. *Piedmont*, 254 U.S. at 13, 41 S.Ct. at 4.

Second, appellees argue that the fact that the coal supplied in *Piedmont* was found to have been partially consumed in the owner's dockside factory instead of in vessels potentially subject to maritime liens is a distinguishing characteristic. While the Supreme Court did note that it was concerned about the potential for nonmaritime use of coal supplied to the owner's dock, *see Piedmont*, 254 U.S. at 13, 41 S.Ct. at 4, a similar problem is presented here by the potential for "inter-modal" use of containers. In an attempt to cure this deficiency, the district court granted maritime liens only to the extent that containers were the "functional equivalent of the hold" of the "C.C. San Francisco." However, under the leasing agreements entered into with CC Line, none of the appellees restricted the "inter-modal" use of their leased containers to exclusively maritime conveyance. Thus, despite the district court's holding below, it cannot be gainsaid that nonmaritime use analogous to that in *Piedmont*, was permitted under the container leasing agreements in issue here.

Finally, it is particularly instructive to compare the similarity in the reasoning supporting the holdings of both the district court in *Piedmont* and the district court in

this action. The *Piedmont* district court, in its attempt to justify a broad interpretation of the "furnishing" requirement, stated:

> "As supplies for fleets of vessels under a common ownership and management in the ordinary course of business are contracted for in view of the general requirements of the entire fleet, as supply men will thus be called upon to furnish supplies in advance of the arrival of the vessels, as at the time supplies are ordered there may be uncertainty as to which vessel may require them and use them, *the statute should receive a construction which will make it applicable to and consistent with modern business conditions.* A supply man who furnished supplies ready for any vessel of a fleet that may call for it should not be deprived of the same right to a lien as a supply man who is told the name of the vessel which is to require the supplies."

240 F. 147, 153 (D.R.I.1917) (emphasis added). The district court in this action similarly stated that

> "In light of today's shipping practices [the bulk leasing of containers], defendant's contention that a container need be furnished to a specific vessel, rather than to a fleet of vessels, in order for a valid maritime lien to exist, is highly impractical."

*Flexivan,* 628 F.Supp at 1079 (emphasis added).

■ Like the Supreme Court in *Piedmont,* we are not persuaded that "modern business conditions" in the shipping industry are sufficient justification to expand the "furnishing to any vessel" requirement of 46 U.S.C. § 971.[4] Accordingly, we hold that cargo containers leased in bulk to a time-charterer of a group of vessels for unrestricted use on board the vessels in that group, are not furnished to any particular vessel of the group, on which they subsequently happen to be employed, within the meaning of 46 U.S.C. § 971.

We reverse the order of the district court with respect to the establishment of maritime liens under the Federal Maritime Lien Act, 46 U.S.C. § 971. This cause is remanded to the district court for further proceedings as may be necessary to discharge the lien.

Reversed and remanded.

J. BLAINE ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that the district court had admiralty jurisdiction over the contracts and that the cargo containers are necessaries under the Federal Maritime Lien Act. Also, I agree that the container leases were entered into by a party authorized to support a lien on the vessel "C.C. San Francisco."

With respect to the holding that the containers were not furnished to the vessel "C.C. San Francisco" in particular, however, I disagree with the majority. In my view, the containers were "furnished" to the vessel under 46 U.S. § 971 in a manner sufficient to attach a lien. The majority finds a restrictive reading of the "furnishing ... to any vessel" requirement is supported by inferential Congressional intent and prior cases interpreting section 971. For me, these two bases are not persuasive. The active and not passive language used in the statute is not a distinction which supports the inference that Congress intended a restrictive reading when viewed against the purpose of the Act. Also, previous cases interpreting section 971 support a broader interpretation of the furnishing requirement.

---

**4.** Appellees' contention that there is no substantive difference between a container company leasing 10 containers to steamship company A, pre-allocating them only for use on a group of 5 specified vessels, and that company leasing 10 other containers to steamship company B, without pre-allocation but where the containers actually were carried aboard five vessels, misses the mark. We are presented with a question of interpretation of the statute and under a narrow interpretation of "furnishing," in neither case would a maritime lien likely attach. The relevant comparison is between companies A & B and a company C which leases an identified set of containers specifically for use on a named vessel.

The purpose behind the Act, as amended in 1971, was as a matter of equity to protect suppliers who in good faith furnish necessaries to a vessel. *See,* H.R.Rep. No. 92–340, 92nd Cong., 1st Sess. 1, *reprinted in* 1971 U.S.Code Cong. & Ad.News 1363–1365; *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.1986) (en banc) ("The statute [46 U.S.C. § 971] was intended to encourage private investment in the maritime industry. We will not begin now to defeat the purpose of the Act by layering technicalities onto its interpretation"). If the purpose of the Act is to be fulfilled, the construction of the "furnishing ... to any vessel" requirement should not be a restrictive one. The majority's restrictive interpretation is contrary to the purpose Congress expressed when it amended the Act. In this, the majority places reliance for its holding upon the fact that the verb "to furnish" is active and not passive. I find this distinction to be of little weight. While use of the active voice may create an inference of Congressional intent, such an inference should be decidedly subordinate to Congress' stated purpose. *See Gulf Trading and Transportation Co. v. M/V Tento,* 694 F.2d 1191, 1194 (9th Cir.1983).

I also find the cases cited by the majority to be inapposite. The question presented is: "Is it a condition precedent to a lien that containers which have been leased to managers of a fleet of container vessels also must have been specifically set apart for use on the particular vessel against which a lien is asserted?" The answer has already been provided and the answer is "no." In *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920), the Court stated:

> [T]he fact that the coal which was supplied to the several vessels had been purchased under a single contract presents no difficulty. For while one vessel of a fleet cannot be made liable under the statute for supplies furnished to the others, even if the supplies are furnished to all upon orders of the owner under a single contract ... each vessel

so receiving supplies may be made liable for the supplies furnished to it.

*Id.* at 10–11, 41 S.Ct. at 4 (citations omitted). The majority's reliance on *Piedmont* is misplaced. In *Piedmont,* delivery was not made to the vessels but to another location, the owner's factory. The parties understood that the owner would be dividing the supplies (coal) between the factory and the vessels. Title to the supplies passed to the factory as an entity before the supplies were divided for vessel and non-vessel usage. *Piedmont* is therefore clearly distinguishable on this ground.

Here, there is no question the lessor presented the containers to CC Line for use by the vessels. The containers were not diverted, after the passing of title to another entity, for non-vessel use. That the CC Line had the authority to interchange the containers between particular vessels is of no consequence since "each vessel so receiving supplies may be made liable for the supplies furnished to it." *Piedmont* at 11, 41 S.Ct. at 4.

Later, in *Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.,* 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), the Court interpreted *Piedmont* as permitting a lien to attach, in that the supplies were "furnished," where delivery was made to a number of vessels since the supplies were presented exclusively for the vessels in question. *Dampskibsselskabet* at 277, 60 S.Ct. at 94. From this it is clear that a contract for delivery of supplies to a number of vessels without designation of particular vessels will not cause a maritime lien to fail under section 971 for want of "furnishing ... to any vessel" as long as there is no diversion of title to an intermediate entity.

The additional cases cited by the majority err for the same reason the majority opinion does. They read *Piedmont* too narrowly. The controlling feature of *Piedmont* is not the result reached but the principle stated. *Piedmont* and its progeny allow a lien to attach to a particular vessel, even though the supplies were not delivered to a

prespecified vessel, if the vessel in fact received the supplies furnished.