**VENTURA PACKERS, INC.,**
a California corporation,
Plaintiff–Appellant,

v.

**F/V JEANINE KATHLEEN, Official No. 972086, her tackle, furniture & apparel in rem; F/V Rose Lee, Official No. 942678, her tackle, furniture & apparel in rem; F/V Talia, Official No. 973296, her tackle, furniture & apparel in rem, Defendants,**

and

**Roger L. Ingman; Jody K. Ingman; Rose Lee LLC; Dennis H. Eames; Andrea J. Eames, Claimants–Appellees.**

No. 00–56448.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 2002.

Filed Sept. 11, 2002.

---

Denise A. Brogna, Lascher & Lascher, Ventura, CA, for the plaintiff-appellant.

Carolyn J. Shields, Bailey & Partners, Santa Monica, CA, for the claimants-appellees.

Before TROTT, THOMAS, and WARDLAW, Circuit Judges.

## OPINION

TROTT, Circuit Judge:

Ventura Packers, Inc. ("Ventura Packers") sued in rem three fishing vessels, the F/V Jeanine Kathleen, the F/V Rose Lee, and the F/V Talia ("the Ships"), to enforce a necessaries lien. On the Ships' motion for summary judgment, the district court dismissed the case for lack of subject matter jurisdiction.

Ventura Packers appealed. We have jurisdiction over its timely appeal pursuant to 28 U.S.C. § 1291. We hold that the Federal Maritime Lien Act, 46 U.S.C. § 31342, establishes statutory elements, which if met, invoke the admiralty jurisdiction of the federal courts. As Ventura Packers established a triable issue of fact regarding whether it met these jurisdic-

tional elements, we reverse the district court's dismissal of its complaint and remand the case for additional proceedings.

## BACKGROUND

In an effort to create economies of scale unavailable to individual anglers, several commercial fishermen banded together to form the Independent Fishermen's Cooperative ("IFC"), incorporated in Alaska by Gregory Kirsch ("Kirsch"). IFC's founding members included Dennis Eames, owner of the F/V Talia, Roger Ingman, co-owner with his wife Jody Ingman of the F/V Jeanine Kathleen, and Richard and Mitchell Eide, owners and masters, at that time, of the F/V Rose Lee, which is now owned by Rose Lee LLC (collectively "the Owners"). IFC's members envisioned making boatloads of money by assuming the risks traditionally borne by the fishing industry's middlemen. Instead of immediately selling the catch at the dock to local fish buyers, IFC decided it would ice, process, package, and transport the fish itself and then sell it for a higher price further down the stream of commerce.

IFC's members opted to participate in the 1996–97 Ventura/ Santa Barbara squid fishing season. As relatively new fishermen to these seas, IFC's members lacked long-term relationships with and, consequently, priority access to local fish unloading facilities. Speed in unloading the catch and priority dock access are essential because if squid is not brought to port, processed, and frozen within twenty-four hours, the squid flesh begins to spoil. Priority docking and unloading services also return a boat to the sea quickly, thereby maximizing its time devoted to harvesting squid and minimizing its time laid up in port. To obtain priority service, IFC, through Kirsch, negotiated with Ventura Packers to unload and document its members' catch. For the 1996–97 season, IFC

agreed to pay Ventura Packers $50/ton to unload and pack the squid; $20/ton "to administer [IFC's] business in Ventura with government entities, transportation companies, processors, and cold storages"; and $10/ton for priority access to Ventura Packers' unloading facilities.

Ventura Packers provided the Ships with priority service on 188 different occasions during the 1996–97 season. Each time a Ship was unloaded, Ventura Packers documented the catch using a California Department of Fish and Game landing receipt ("California fish ticket"), many of which bear the signature of the Ship's owner or master. The sea yielded a bountiful 1996–97 squid season. Ventura Packers unloaded a total of 5,892 tons of squid from the Ships: 2,437 tons from the Rose Lee; 1,554 tons from the Talia; and 1,901 tons from the Jeanine Kathleen. At a sales price of $250/ton, this squid tonnage amounted to nearly $1,473,000 for the Ships. Despite the profitable fishing season, however, the Ships allegedly failed to settle their respective accounts with Ventura Packers. Ventura Packers claims that at season's end, the Jeanine Kathleen owed $22,000; the Talia owed $43,000; and the Rose Lee was in the red a whopping $105,000. The Ships, of course, dispute their liability as well as the accuracy of these amounts.

To recover these allegedly unpaid amounts, Ventura Packers filed suit in state court against IFC. While the state suit was pending, Ventura Packers filed this in rem admiralty action against the Ships pursuant to Federal Rule of Civil Procedure 9(h) and Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims. Ventura Packers alleged a necessaries lien under § 31342 and requested arrest of the Ships. The Owners intervened and submitted undertak-ings, a type of maritime bond, in lieu of having the Ships arrested. The Owners then moved to dismiss the complaint for lack of subject matter jurisdiction. The district court initially denied the Owners' motion to dismiss.

The Owners answered, and discovery proceeded. The parties cross-moved for summary judgment. The Owners again argued that the district court lacked subject matter jurisdiction to adjudicate the action. Ventura Packers responded that admiralty jurisdiction was proper under 46 U.S.C. § 31342 and the common law. The district court granted the Owners' motion and dismissed the case.

Ventura Packers appeals.

## STANDARD OF REVIEW

We review the grant of summary judgment de novo. *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 910(9th Cir.1997). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. *Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.1999). We review de novo the district court's determination that it lacked subject matter jurisdiction, *H2O Houseboat Vacations Inc. v. Hernandez*, 103 F.3d 914, 916 (9th Cir. 1996), and the district court's interpretation of 46 U.S.C. § 31342, *Port of Portland v. The M/V Paralla*, 892 F.2d 825, 827 (9th Cir.1989).

## DISCUSSION

### I Existence of Admiralty Jurisdiction[1]

"The precise scope of admiralty jurisdiction is not a matter of obvious prin-

---

1. Ventura Packers argues that the district court had subject matter jurisdiction over its

ciple or of very accurate history." *The Blackheath*, 195 U.S. 361, 365, 25 S.Ct. 46, 49 L.Ed. 236 (1904). Though not confined to vessels, admiralty naturally centers around them, as the great agents of maritime affairs. Here, the district court held it lacked admiralty jurisdiction because the contract between Ventura Packers and IFC was not a wholly maritime contract and its maritime portion could not be severed from its non-maritime portion without prejudice to the Ships. We agree with the district court that the contract is not wholly maritime and is not severable. The district court, however, did not consider whether Congress provided an independent statutory basis for admiralty jurisdiction by enacting 46 U.S.C. § 31342.

■ [2] The relevant section of the Maritime Lien Act, 46 U.S.C. § 31342,[2] provides:

(a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

    (1) has a maritime lien on the vessel;

    (2) may bring a civil action in rem to enforce the lien; and

    (3) is not required to allege or prove in the action that credit was given to the vessel.

(b) This section does not apply to a public vessel.

Ventura Packers argues that § 31342 provides particular elements, which if met, allow the federal district court to exercise its admiralty jurisdiction. The Ships respond that admiralty jurisdiction is proper only upon meeting the common law requirement that a maritime contract underlie the necessaries lien. We agree with Ventura Packers. If a plaintiff demonstrates that he (1) provided necessaries (2) to a vessel (3) on the order of the owner or a person authorized by the owner, then he may bring a civil action in rem to a federal district court sitting in admiralty.

*See Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir.1985) (noting that ordinarily we do not consider issues not raised below).

suit in rem based on federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, 28 U.S.C. § 1332. These arguments are meritless. If the district court had jurisdiction over this in rem action, it was in admiralty or not at all. *Madruga v. Superior Court*, 346 U.S. 556, 560, 74 S.Ct. 298, 98 L.Ed. 290 (1954); *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 665 (7th Cir.1998) (per curiam) ("[A]n in rem claim . . . is within the exclusive admiralty jurisdiction of the federal courts."); *Guidry v. Durkin*, 834 F.2d 1465, 1469 (9th Cir.1987) ("[I]n rem actions involving maritime liens fall within the exclusive admiralty jurisdiction of the federal district courts.").

Ventura Packers additionally requests leave to amend to invoke properly diversity jurisdiction. To do so, Ventura Packers would need to name new defendants because a vessel is not a citizen of any state and cannot be sued in diversity. *See Powell v. Offshore Navigation, Inc.*, 644 F.2d 1063, 1065 n. 3 (5th Cir.1981). Ventura Packers did not make this request before the district court, and we decline to address it for the first time on appeal.

2. First codified in 1910, the Maritime Lien Act sought to clarify under what circumstances a valid necessaries lien arises. It did away with the artificial distinction, expressed in *The General Smith*, 4 Wheat. 438, 17 U.S. 438, 443, 4 L.Ed. 609 (1819), that a maritime lien was given for supplies provided in a foreign port but not for those furnished in the vessel's home port. It also rejected the presumption that, when the owner contracts in person for necessaries or is in port when they are ordered, the supplier did not rely on the credit of the vessel. *See generally Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 11, 41 S.Ct. 1, 65 L.Ed. 97 (1920). The current version of the Maritime Lien Act, 46 U.S.C. §§ 31341–31342, succeeds its predecessor, 46 U.S.C. §§ 971–973. Although Congress altered the text of the statute, it intended no substantive change.

## A. The Maritime Lien Act Expresses the Elements Necessary To Invoke the District Court's Admiralty Jurisdiction.

A federal court's authority to hear cases in admiralty flows initially from the Constitution, which extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Congress, in turn, embodied that power in a statute giving federal district courts "original jurisdiction ... of ... [a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).

■ As the Constitution fixed only the original jurisdiction of the Supreme Court, however, Congress remains free to mold the scope of the federal courts' admiralty jurisdiction as it pleases, and it does so from time to time. *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 48, 55 S.Ct. 31, 79 L.Ed. 176 (1934) (noting that Congress may extend admiralty jurisdiction so long as it keeps within "a proper conception of maritime concerns"). The Judiciary Act of 1789, for example, conferred upon the federal district courts exclusive jurisdiction over all cases arising from seizures made on navigable waters under the laws of impost, navigation, or trade of the United States. *See* 1 Erastus C. Benedict, *Benedict on Admiralty* § 109, at 7–21 (2002). Since then, Congress has periodically enacted specific legislation extending the conditions under which the federal courts may exercise their admiralty jurisdiction. For example, in 1948, Congress extended admiralty jurisdiction "to [ ] include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740. Prior to the enactment of § 740, an action in admiralty could not have been maintained against a vessel for damages resulting from its collision with a shore structure. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532–33, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995).

Most analogous to this case, in 1920, Congress enacted the Death on the High Seas Act ("DOHSA"), which defined a cause of action in admiralty "[w]henever the death of a person shall be caused by wrongful act ... on the high seas beyond a marine league from the shore." 46 U.S.C. § 761. On its face, DOHSA requires only that: (1) a wrongful death occur (2) on the high seas (3) beyond one marine league from shore. If a plaintiff meets those requirements, DOHSA seemingly authorizes that she may bring a wrongful death action in admiralty. By contrast, a common law wrongful death action must include the jurisdictional element that the action bear "a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 271, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Congress, however, omitted any mention of this common law jurisdictional element from DOHSA.

■ Although several courts initially presumed that DOHSA implicitly contained the common law's jurisdictional requirement, *see, e.g., Miller v. United States*, 725 F.2d 1311, 1313–15 (11th Cir. 1984), the prevailing view holds that DOHSA established independent requirements for the exercise of admiralty jurisdiction. In *Offshore Logistics, Inc. v. Tallentire*, the Supreme Court held that "admiralty jurisdiction is *expressly provided* under DOHSA because the accidental deaths occurred beyond a marine league from shore." 477 U.S. 207, 218, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (emphasis added); *see also Executive Jet*, 409 U.S. at 271 n. 20, 93 S.Ct. 493 ("[U]nder the Death on the High Seas Act, a wrongful-death ac-

tion arising out of an airplane crash on the high seas beyond a marine league from the shore of a State may clearly be brought in a federal admiralty court."). In *Tallentire*, the Court alternatively held: "Even without this statutory provision [DOHSA], admiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity." *Tallentire*, 477 U.S. at 218–19, 106 S.Ct. 2485. By explicating admiralty jurisdiction under DOHSA distinctly from admiralty jurisdiction at common law, the Supreme Court demonstrated that DOHSA provides independent elements, which if met, trigger the admiralty jurisdiction of the federal courts. *Id.*

■ We discern no meaningful distinction between the Maritime Lien Act's and DOHSA's treatment of admiralty jurisdiction. Although both statutes have analogs at common law, each statute expressly and independently provides for a cause of action in admiralty, upon the fulfillment of certain elements. We, therefore, follow the Supreme Court's lead in *Tallentire* and conclude that the Maritime Lien Act supplies a basis for admiralty jurisdiction independent from those bases available at common law. In so interpreting the Maritime Lien Act, we neither add nor subtract from what Congress passed into law. Specifically, we hold Ventura Packers must demonstrate that: (1) it provided necessaries; (2) to a vessel; (3) by order of the owner or a person authorized by the owner. *See Robert E. Derecktor, Inc. v. Norkin*, 820 F.Supp. 791, 792 (S.D.N.Y.1993) ("The district courts have subject matter jurisdiction ... by ... 46 U.S.C. § 31342, which provides for maritime suits for failure to pay for necessaries to be provided to a vessel."). If Ventura Packers demon-

strates these elements, it may invoke the admiralty jurisdiction of the federal courts to enforce a necessaries lien in rem.

**B. A Maritime Contract Is Not Needed To Invoke Admiralty Jurisdiction Pursuant to the Maritime Lien Act.**

The Owners argue that Ventura Packers must establish the common law requirement of a maritime contract before it can invoke the admiralty jurisdiction of the district court to enforce a necessaries lien. We disagree. Although a maritime contract may support admiralty jurisdiction, it is not an essential prerequisite to a civil action in admiralty to enforce a statutory necessaries lien.

In general, maritime liens, including necessaries liens, exist to keep ships moving in commerce, while preventing them from sailing away from the debts they incur. The theoretical basis for the maritime lien rests on the legal fiction that the ship itself caused the loss and may be called into court to make good. Maritime liens arise for the unpaid provision of necessaries, breaches of maritime contracts, unpaid seaman's wages, unpaid cargo freight, preferred ship mortgages, as well as in other circumstances. *See* 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* 496–98 (3d ed.2001) (listing cognizable maritime liens). Although most maritime liens arise by operation of general maritime law, several are created by statutes, such as the Maritime Lien Act or the Ship Mortgage Act, 46 U.S.C. §§ 31301–31343.

■ Some maritime liens are based on breaches of an underlying contract, but such a contract is not a prerequisite to assert a valid maritime lien. *See Farwest Steel Corp. v. Barge Sea Span 241*, 769 F.2d 620, 621 (9th Cir.1985) ("The district court had admiralty jurisdiction if it was adjudicating either a maritime lien or a

contract relating to the repair of an already constructed vessel.") (citations omitted). For example, a maritime lien for collision is not based upon contract nor is a maritime lien arising from a maritime tort. Therefore, the existence of a maritime contract is not an essential precondition of admiralty jurisdiction to enforce a maritime lien; it is simply one method by which a maritime lien may arise under general maritime law. *See Albany Ins. Co. v. M/V Istrian Express,* 61 F.3d 709, 710 (9th Cir.1995) ("This Circuit recognizes a maritime tort lien irrespective of contractual obligations.").

Like the maritime lien for collision or tort, the maritime lien for necessaries created by § 31342 is not predicated on the existence of a maritime contract. Section 31342 does not mention a maritime contract requirement, and we have unearthed no reason to impute one. Instead the statute provides for an action in admiralty if necessaries were provided to a vessel "on the *order* of the owner or a person authorized by the owner." Necessaries provided on the order of the owner do not inherently require a maritime contract, and nothing hints that Congress intended the "order" of necessaries to be synonymous with "maritime contract" for necessaries. If Congress had intended a maritime contract requirement for an action in admiralty to enforce a necessaries lien under the Maritime Lien Act, we believe it would have said as much and not left us to infer that the federal courts' jurisdiction rests on an anachronistic common law jurisdictional requirement.

The Supreme Court's decision in *The Resolute,* 168 U.S. 437, 18 S.Ct. 112, 42 L.Ed. 533 (1897), does not compel a different result. In *The Resolute,* the Court considered an action for unpaid seamen's wages. *Id.* at 439, 18 S.Ct. 112. At that time, no statute provided the seamen with a right of action in admiralty, so the seamen invoked the admiralty jurisdiction of the federal district court based on the breach of a maritime contract. *Id.* The defendant countered that the seamen could not assert a valid lien, and thus, the district court lacked admiralty jurisdiction to adjudicate the matter. *Id.* at 440, 18 S.Ct. 112.

The Supreme Court rejected the defendant's argument. The Court held that jurisdiction was proper if the contract sued upon was a maritime contract and if the property proceeded against was in the custody of the court. *Id.* at 439, 18 S.Ct. 112. The "question of lien or no lien [wa]s not one of jurisdiction, but of merits." *Id.* at 440, 18 S.Ct. 112.

While applicable to common law admiralty actions based on the breach of a maritime contract, we believe *The Resolute* is inapplicable to the case before us. In *The Resolute,* the seamen claimed a lien for unpaid wages, not a statutory necessaries lien like the one claimed by Ventura Packers. Indeed, a statutory necessaries lien was unavailable to *The Resolute's* seamen because the Maritime Lien Act was not enacted until 1910—thirteen years after *The Resolute.* The seamen, therefore, had to demonstrate admiralty jurisdiction by meeting the common law requirements based on the breach of a maritime contract: the arrest of the vessel and a maritime contract. Whether the seamen held a valid lien remained a question of the merits reserved for the trier of fact.

If Ventura Packers had asserted admiralty jurisdiction based on breach of contract, *The Resolute* would apply. In that case, Ventura Packers would have had to prove the arrest of the Ships and existence of a maritime contract. The district court interpreted Ventura Packers' suit in this fashion. Ventura Packers, however, did not rest its assertion of admiralty jurisdic-

tion entirely on the common law. Unlike the seamen in *The Resolute,* Ventura Packers brought suit in admiralty as provided by Congress in the Maritime Lien Act.

In *Logistics Management, Inc. v. One (1) Pyramid Tent Arena,* we considered our exercise of jurisdiction over an action in rem to enforce a cargo lien arising from the breach of an affreightment contract. 86 F.3d 908, 911–12(9th Cir.1996). A cargo lien arises under general maritime law when the owner of freight fails to pay for its carriage. Under such circumstances, the vessel owner may hold the cargo until payment arrives, or sell the cargo to recover the cost of carriage.

In *Logistics Management,* the plaintiff asserted admiralty jurisdiction based on breach of a maritime (affreightment) contract. *Id.* at 912 & n. 4. The defendant argued that "the determination of a valid lien is a prerequisite for[admiralty] jurisdiction." *Id.* at 911–12. Faced with a situation analogous to the one in *The Resolute,* we reaffirmed the vitality of *The Resolute's* antediluvian rule: " 'The question of lien or no lien is not one of jurisdiction, but of merits.' " *Id.* at 912(quoting *The Resolute,* 168 U.S. at 440, 18 S.Ct. 112).

Ventura Packers implores us to "revisit our holding in Logistics Management." However, such drastic action is unnecessary. The plaintiff in Logistics Management asserted admiralty jurisdiction to enforce its cargo lien based on breach of a maritime affreightment contract. Unlike Ventura Packers, the Logistics Management plaintiff did not assert admiralty jurisdiction to enforce a necessaries lien based on the Maritime Lien Act or any other statute. Indeed, the Maritime Lien Act was not available to the Logistics Management plaintiff because it encompasses only necessaries liens, not cargo liens. Therefore, Logistics Management,

like *The Resolute,* bears not at all on whether the Maritime Lien Act statutorily confers admiralty jurisdiction to enforce a necessaries lien.

Unencumbered by the inapposite holdings of *The Resolute* and *Logistics Management,* we hold that the Maritime Lien Act establishes specific elements, which if met, permit Ventura Packers to invoke the admiralty jurisdiction of the district court. If Ventura Packers (1) provided necessaries (2) to the Ships (3) on the order of the Owners or a person authorized by the Owners, then it may bring an action in admiralty to enforce the resulting necessaries lien. Ventura Packers need not demonstrate any other jurisdictional element, and it certainly need not rely on the Ships' breach of a maritime contract to invoke admiralty jurisdiction.

We note that some might construe our holding as a deviation from the Eleventh Circuit's decision in *E.S. Binnings, Inc. v. M/V Saudi Riyadh,* 815 F.2d 660 (11th Cir.1987), *overruled on other grounds by Exxon Corp. v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 612, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). In *E.S. Binnings,* the court concluded that a contract for a shipping agent's services was nonmaritime in nature, and thus no admiralty jurisdiction existed. *Id.* at 666. In so holding, the Eleventh Circuit rejected the argument that the Maritime Lien Act provided an independent basis for jurisdiction over *nonmaritime* concerns, like the disputed agency contract in question. *See id.* at 666 n. 6 ("[T]he FMLA did not extend admiralty jurisdiction into traditionally nonmaritime areas ....."); *id.* at 667(" '[T]o be a lien on any theory a claim must be in the first instance maritime.' ") (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 9–35, at 659 (1975)). As we read *E.S. Binnings,* the court expressed no opinion whether the Maritime Lien Act provides

jurisdiction over a suit concerning a traditionally maritime concern. *Id.* at 666 ("[T]o give rise to a maritime lien, the occurrence out of which the ... dispute arose must itself be maritime and that means that the occurrence must be within the admiralty jurisdiction of the United States as established by the Constitution and adopted by the Congress.") (internal quotations omitted).

Our decision, by contrast, holds that the Maritime Lien Act may provide an alternate route to jurisdiction over an action involving the provision of necessaries, an act which is, by definition, maritime. In fact, the Maritime Lien Act's jurisdictional elements ensure the requisite close connection between the goods or services provided and traditional maritime concerns. A farmer in Nebraska, for example, could not invoke admiralty jurisdiction to resolve a disputed tractor sale, even if he asserted a lien against his adversary's boat in San Diego. The farmer's assertion of the lien is of no consequence to the question of admiralty jurisdiction. As in *E.S. Binnings,* admiralty jurisdiction would not lie because the farmer could not demonstrate any tie to a traditional maritime concern. Certainly, he could not meet the Maritime Lien Act's requirements because he did not provide necessaries to a vessel on the order of the owner or a person authorized by the owner.

Instead of disrupting established maritime expectations, as our detractors lament, we think our holding will facilitate modern maritime commerce. Ships will be accountable for the necessaries provided to them, whether or not they received those necessaries as part of a wholly, partially, or nonmaritime contract. In turn, suppliers can provide an array of maritime and nonmaritime goods and services to ships, secure in their ability to recoup at least the value of those necessaries provided.

Having crafted the rule, we are left only to consider whether Ventura Packers met the statutory elements for admiralty jurisdiction provided by the Maritime Lien Act.

## II Exercise of Admiralty Jurisdiction

■ In this case, the district court did not consider whether the Maritime Lien Act provided an independent basis for the exercise of its admiralty jurisdiction. As the parties have fully briefed the issue, we will examine it. In so doing, we are cognizant that the Maritime Lien Act enumerates the elements required for *both* a valid necessaries lien and the right to enforce that lien in admiralty.

■ Usually, a district court is free to hear evidence regarding jurisdiction and to resolve factual disputes in determining whether it has jurisdiction over a claim. *Careau Group v. United Farm Workers of Am.,* 940 F.2d 1291, 1293(9th Cir.1991). "However, where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment." *Steen,* 106 F.3d at 910 (internal quotation marks and citations omitted). In this case, the Maritime Lien Act inextricably intertwines the questions of subject matter jurisdiction and Ventura Packers' substantive claim for relief; accordingly, we consider both questions according to the standards applicable on summary judgment. *See id.; see also Timberlane Lumber Co. v. Bank of Am.,* 549 F.2d 597, 602 (9th Cir.1976).

The Maritime Lien Act provides that a person (1) providing necessaries (2) to a vessel (3) on the order of the owner or a person authorized by the owner has a necessaries lien on the vessel and may bring a civil action in rem to enforce that lien. We now consider the jurisdictional component of each element set forth in the Maritime

Lien Act under the summary judgment standard.

## A. Providing Necessaries

█ Necessaries are defined as "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). The list is not exhaustive, and in fact, modern admiralty jurisprudence interprets "necessaries" broadly, as anything that facilitates or enables a vessel to perform its mission or occupation. *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 603 (5th Cir.1986); *Farwest Steel,* 769 F.2d at 623. The term "necessaries" includes most goods or services that are useful to the vessel and keep her out of danger. *See Equilease,* 793 F.2d at 603. "Necessaries" indubitably include the things a prudent owner would provide to enable a ship to perform her particular function. *Id.*

█ The Ships were engaged in squid fishing, and the services provided by Ventura Packers facilitated their performance of that particular task. Priority dock access and efficient unloading services returned the Ships to sea quickly, thereby maximizing the number of squid caught and the profit gained. *See Porello,* 330 U.S. at 456, 67 S.Ct. 847(holding unpaid stevedores asserted a maritime necessaries lien); *see also* William Tetley, *Stevedores & Maritime Liens,* 8 Mar. Law. 269, 270 (1983). Such services also ensured the freshness and marketability of the catch. Some evidence also indicates that Ventura Packers provided goods to the Ships.

The district court did not reach the issue whether the goods and services provided by Ventura Packers to the Ships were necessaries. We decline to decide this issue in the first instance, and hence, leave for the district court to determine whether the goods and services furnished by Ventura Packer are properly deemed necessaries, and if so, the extent and value of those necessaries.

## B. To a Vessel

█ Ventura Packers unloaded the Ships when they arrived in port 188 times during the 1996–97 Ventura/Santa Barbara squid fishing season. The Owners claim that Ventura Packers' services were provided pursuant to a contract with IFC, and therefore, the services were provided to IFC and not to the Ships themselves. In essence, the Owners claim that Ventura Packers provided services to the Ships as IFC's subcontractor, and thus, that Ventura Packers is not a proper lien claimant. *See The Juniata,* 277 F. 438, 440 (D.Md. 1922) (rejecting subcontractor as a lien claimant). In the alternative, the Owners claim that Ventura Packers' services were furnished to IFC's fleet of ships and not to the Ships individually. *See Piedmont,* 254 U.S. at 8, 41 S.Ct. 1; *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A.,* 808 F.2d 697, 701–03 (9th Cir.1987).

Ventura Packers contends that it provided goods and services directly to each Ship and invoiced each Ship individually. Ventura Packers insists that, unlike the coal supply company in *Piedmont,* which provided bulk coal to a ship owner who then apportioned the coal among his fleet, it provided no bulk services to IFC. We conclude that a genuine issue of material fact remains regarding whether Ventura Packers' goods and services were provided to the Ships.

## C. On the Order of the Owner

█ Whether the services provided by Ventura Packers were provided on the order of the owner or a person authorized by the owner also remains a matter vigorously disputed. That Ventura Packers contracted with IFC is beyond question. The Ships claim, however, that IFC had no

**924**

authority to act as their agent, and thus, the necessaries provided to the Ships were not on the order of the Owners.

The IFC Articles of Incorporation designate IFC as a "common marketing agency" for its members, and deposition testimony suggests that IFC members understood that IFC would act as their agent in procuring goods and services essential to the 1996–97 squid fishing season. Even if IFC was not authorized to act as the Owners' agent, the Owners themselves authorized many of Ventura Packers' services. On numerous occasions, the Owners verbally requested service from Ventura Packers en route to port, and many of the California fish tickets bear the signature of the Ships' owners and masters. The Owners argue, on the other hand, that IFC acted as a nonprofit organization that purchased fish from its members, resold the fish to third persons with an eye towards negotiating the best price possible, and distributed the profits, if any, back to its members. The district court found the IFC Articles of Incorporation supported this view as well.

We, therefore, leave for the trier of fact to decide whether Ventura Packers provided the Ships with goods and services on the order of the owner or a person authorized by the owner. This inquiry will determine whether there is admiralty jurisdiction and whether Ventura Packers prevails on the merits.

## CONCLUSION

The Maritime Lien Act, 46 U.S.C. § 31342, like DOHSA, provides a statutory basis for the exercise of a district court's admiralty jurisdiction. In this case, Ventura Packers adduced sufficient evidence to survive summary judgment, and there-fore, we reverse and remand the case for additional proceedings.

REVERSED and REMANDED.